IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2011

**STATE OF TENNESSEE v. JAMES BRITT**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-05557     W. Mark Ward, Judge**

_____

**No. W2010-02090-CCA-R3-CD  - Filed June 5, 2012**

_____

A Shelby County Grand Jury returned an indictment against Defendant, James Britt, charging him with premeditated first degree murder. Following a jury trial, Defendant was convicted of the offense and received a life sentence. On appeal, Defendant argues that the evidence was insufficient to support his conviction and that the trial court erred in admitting two autopsy photographs.  After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, PJ., and NORMA MCGEE OGLE, J., joined.

Juni S. Ganguli, Memphis, Tennessee, for the appellant, James Britt.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General; Patience Branham, Assistant District Attorney General; and Jen Morris, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Kelly Czekalski spoke to her sister, Jennifer Britt (the victim), on February 24, 2008, sometime between 7:30 and 9:00 p.m. in a phone conversation.  The victim was very upset and sounded as though she had been drinking or using drugs.  Ms. Czekalski testified that she spoke with the victim for thirty to forty-five minutes and calmed her down.  She said that the victim wanted to know the whereabouts of her daughter, who had been staying with the

victim's aunt in Wisconsin. Ms. Czekalski's grandmother later called her around 2:00 a.m. and said that the victim had been killed.

Kristi Tackett, the victim's neighbor, testified that during the day on February 24, 2008, she and her children were looking out a back window and saw the victim and Defendant fist fighting in their front yard. The two then went inside the house and came back out around dark and continued fighting. Ms. Tackett explained that the victim and Defendant's house did not have any electricity, and the couple used the street light between the two houses for light. Ms. Tackett saw the victim hit Defendant in the face "with something or her hand." She testified that the victim and Defendant then went back inside the house and continued fighting, and she then heard two gunshots approximately twenty minutes later. Ms. Tackett testified that some other neighbors called police, and she saw "the big guy" who lived with Defendant and the victim run outside, and he was "running in circles saying he shot her." When police arrived on the scene, Ms. Tackett told an officer what she had heard. Ms. Tackett testified that Defendant and the victim "would fight all the time."

Renee LaMondue, a communications supervisor for the Memphis Police Department, testified concerning the 911 call of the shooting. She said that a female neighbor called the police department for a "male neighbor, stating that the male can't speak with us, stating that he has accidently shot his wife in the head."

Officer Joseph Johnson of the Memphis Police Department was the first officer on the scene. There were a "handful" of people in the front yard of the residence, and he spoke to Defendant who said that he had accidently shot his wife. Officer Johnson went inside the residence, which was dimly lit, and saw the victim lying on a bed located to the left side of the door in the living room. He saw that the victim had a gunshot wound to her head, and he immediately "backed out" of the house and secured the scene. Officer Johnson testified that the house was messy and "extremely dirty."

Daryl McConnell, a firefighter paramedic for the Memphis Fire Department, responded to the scene of the shooting. He walked inside the residence and saw the twenty-five-year-old victim lying on her right side in the bed with a gunshot wound to her head. "She had no pulse, was not breathing, was not moving. Her lips were purple, had the beginning stages of lividity, which is basically purpleness around the chest area, which is indicative of no circulation in the body." Mr. McConnell testified that he placed a heart monitor on the victim, and it showed no electrical activity in her heart. There was a .357 Magnum revolver lying on the bed.

Crime scene investigator Marlon Wright secured the evidence and photographed the scene. He found the victim lying in the bed fully clothed with a gunshot wound to the back

of her head, and the pistol was lying next to her. Officer Wright testified that the house did not have electricity, and he and other officers used several flashlights to light the area. He examined the gun and found blood and human tissue on the barrel and cylinder. Officer Wright looked inside the cylinder and noted that two of the six rounds had been fired. He said that one of the fired bullets was at the twelve o'clock position and the other was at the six o'clock position. Officer Wright also noted that if a gun had been fired twice in rapid succession, the bullets would have fired in order. Gunshot residue tests were obtained from Defendant and Timothy Britt and sent to the Tennessee Bureau of Investigation (TBI) for analysis. Officer Wright testified that the house was disorganized and cluttered with a small walkway from the front door to the bed.

Crime scene investigator Thomas Ellis was called to the scene and recovered two .357 spent shell casings from the residence. He could not determine when the casings were fired.

At the scene, Officer Robert Tutt of the Felony Response Unit spoke with Defendant's brother, Timothy Britt, who lived with Defendant and the victim. He described Mr. Britt as having "a very limited mental capacity," and he was only able to tell Officer Tutt that he was in the house and heard a gunshot. Mr. Britt was later driven to the police department where he gave a statement.

Detective William Merritt of the Homicide Squad was asked to help interview Defendant on February 25, 2008. At the time of the interview, he said that Defendant had some cuts and abrasions to his face. One eye was blackened and swollen, and he had scratches and abrasions on his nose. Defendant signed a waiver of rights and agreed to talk to officers. Defendant told Detective Merritt that he and the victim had been married a little more than a month and had lived at 1542 Tennyson Road "[a]bout two weeks before [they] got married at the most." He said that his brother, Timothy Wilson Britt, also lived in the residence. Defendant said that he accidentally shot the victim one time while she was lying on the bed with his ".357 Magnum, 2-inch sub-nose Rossi stainless steel." He thought that he had owned the gun approximately a week before the shooting or "[m]aybe longer." The victim owned a .380 caliber pistol that was purchased approximately three days before Defendant bought his gun. Defendant said that he and the victim usually kept their guns and ammunition under the pillow. He told Detective Merritt that he last fired his .357 Magnum the day before or a couple of days before the shooting because he had fired only "twice before that." He also said that he fully reloaded the gun after shooting it. Defendant testified that the victim also fired her weapon the day before or a couple of days before the shooting both inside and outside of the house.

Concerning the circumstances of the shooting, Defendant gave the following statement:

We come in and she was getting ready to prepare dinner. We was lying on the bed. We started having sex but we didn't finish because she said, quote, I seen a shadow, end quote. That's when I got up, got my gun, went outside. I seen a figure go down between the house and a truck so I went after the figure for a little bit but he took off running. He went through the backyard and through the fence and disappeared. By that time maybe 45 seconds to a minute went by and I come back in. She asked me who it was - - or who was it and I said I don't know. And I was coming around the kerosene heater, tripped over a flashlight or a bowl and that's when I fell down over the bed close to her. When my head hit, the gun went off 'cause I lost my balance. Then I shook her arm just a little bit to see but I couldn't get no response. I could tell she was breathing just a little a little [sic] so I looked for the cell phone and couldn't find it. It was too dark. So I woke my brother up. I thought he was in the bed but apparently he was in the bathroom. I told him to stay in the living room 'cause I was running across the street to use a telephone but he followed me out on the porch. While I was using the telephone, the neighbors were calling 911. The police pulled up maybe a minute and a half later. I didn't get to make it back in the house.

Defendant said that he was "[m]aybe a foot or foot and a half" from the victim when the gun discharged, and he was not leaning over or touching her at the time. He said that the injuries to his face occurred when he "tripped and slammed face first into the gun and it went off."

Defendant told Detective Merritt that he and the victim had not been arguing before the shooting and that the victim was upset because "her Aunt Kay would not let her talk to her daughter for 10 days." He also said that the victim had never struck or attacked him. Defendant noted that he might "be wrong on the two shots 'cause I don't remember shooting but one." Defendant did not mention that he or the victim had been drinking. Because of some inconsistencies in Defendant's statement, Detective Merritt asked him to draw a sketch of the scene. Detective Merritt noted that although Defendant said that he and the victim began having sex before the shooting, she was fully clothed and wearing "army-type boots" and a coat. Defendant also said that he did not have a cell phone and indicated that 1542 Tennyson was an abandoned house with no electricity.

Dr. Marco Ross, Deputy Chief Medical Examiner, performed an autopsy on the victim. He determined that she died from a "contact gunshot wound with a contact entrance wound behind the left ear." Because there was "soot deposition in and on the edges of the wound" and lacerations to the skin around the wound, Dr. Ross concluded that the muzzle of the weapon was in contact with the victim's skin. He testified that the "bullet tract had perforated and fractured the skull as well as perforated the brain." Dr. Ross opined that the

victim died immediately or within a few seconds of being shot. Concerning the victim's other injuries, Dr. Ross noted:

> She had several contusions or bruises, including one on the left side of the neck, one on her left upper back, one on the inner front part of the right thigh, one on the inner front part of the right knee, several contusions on front of the lower legs as well.

The victim's right shin had bruises from her knee to her ankle, and there was also a bruise on the back of her left arm. There was some alcohol present in the victim's blood at a level of 82 milligrams per deciliter, which corresponded to approximately .08 on the Breathalyzer scale. Sergeant Paula Harris of the Memphis Police Department picked up a bullet pack, a gunshot residue kit performed on the victim, and the victim's clothing from the morgue. She explained that a bullet pack contains either " a fragment or an entire projectile or a jacket, some piece of a bullet that the medical examiner takes."

Agent Steve Scott, of the TBI Firearms Identification Unit, examined the ballistics evidence in this case. Concerning Defendant's gun, Agent Scott testified:

> The .357 Magnum is the caliber of the revolver. It is a double-action revolver, meaning there are two ways this gun can be fired once it's loaded. Cartridges are loaded into the cylinder. It is then rotated up and closed. The first way to fire that would be to thumb back or pull back the hammer and then pull the trigger. That motion is called single-action firing because when you pull the trigger, the gun does one action, allowing the hammer to fall. The other way to fire this particular revolver is simply just to load it, close the cylinder and pull the trigger. That is the double-action mode of firing. And double-action mode actually rotates a cartridge into the firing position, cocks the hammer and also allows it to fall.

Agent Scott noted that the "double-action trigger pull" takes "approximately 15 pounds of pressure pulling with the finger in order to cause the weapon to discharge." He further said, "It would be my opinion that the 15 pounds would have to be applied with some intention." Agent Scott testified that single-action firing would require approximately 3 and 3/4 pounds of pressure on the trigger after the hammer was cocked to fire the weapon. Concerning accidental firing in a single-action pull, Agent Scott said:

> I wouldn't think it would be accidental to cock the gun and actually pull the hammer back into that cocked position. However, I can somewhat see with the

finger on the trigger and a struggle or something of that nature, any squeezing of the hand could cause the gun to discharge.

Agent Scott testified that the revolver had a six-chambered cylinder that contained two fired cartridges and four unfired cartridges, one of which had a "very small indentation on the primer surface that could be a partial firing pin impression." He explained that a "partial firing pin impression is just simply where the firing pin of the gun just barely has an impact on that primer, not enough to cause a detonation of the primer." He said that there was a possibility that the partial impression was caused by some "play" on the hammer of the gun. Agent Scott testified that one of the fired bullets in the revolver was in the twelve o'clock position and the other was in the six o'clock position. Concerning the firing sequence, he said:

> Well it's not the normal firing sequence to have fired two shots in succession. [sic] As you can see, here is one fired cartridge case and here is the other fired cartridge case. They're opposite each other. Normally if two shots are fired one right after another, say one cartridge case would be here, the next would be here. This particular cylinder and the style of gun, when the cylinder rotates to bring the next cartridge in line, it rotates counter-clockwise so from right to left the top of this moves. So this cartridge - - if this one was the first one fired, then this one would be the second one to be fired. And if that were the case, then this cartridge case is out of place. It should be here rather than down here in the five [sic] o'clock position.

Agent Scott surmised that the unusual location of the fired bullets could be due to the cylinder being rotated between shots being fired, or by the cylinder being emptied and the bullets and spent shells being replaced.

Agent Scott examined the bullet recovered from the victim and a bullet fragment. He determined that the bullet was fired from Defendant's weapon. He was unable to determine whether the fragment was fired from Defendant's weapon "because of its size and the lack of a very prominent rifling on it."

Agent Scott testified that he reviewed the gunshot residue kits from the victim, Timothy Britt, and Defendant. He explained that the examination of the kits were performed by other TBI scientists. On Defendant's kit, the results indicated that "no controlled swabs were submitted, therefore no analysis was performed," and the results from Timothy Britt were inconclusive.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence and argues that the State failed to prove the element of premeditation beyond a reasonable doubt. When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another [.]" Tenn. Code Ann. § 39–13–202(a)(1). "Premeditation" is defined in our criminal code as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39–13–202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of

a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

Viewed in the light most favorable to the State, the evidence established that Defendant shot the unarmed victim while she was lying in bed. A neighbor, Kristi Tackett, had seen the victim and Defendant fist fighting in their front yard prior to the shooting. She also saw the victim hit Defendant in the face "with something or her hand." Ms. Tackett said that she heard the victim and Defendant continue to fight after they went back inside the house, and she then heard two gunshots. At the time of his interview, Defendant had scratches and abrasions on his nose, and one eye was blackened and swollen. Although Defendant claimed that he was "[m]aybe a foot or foot and a half" from the victim when he tripped causing the gun to discharge, the testimony by the medical examiner belies this claim. Dr. Marco Ross testified that the victim died from a "contact gunshot wound with a contact entrance wound behind the left ear." Because there was "soot deposition in and on the edges of the wound" and lacerations to the skin around the wound, Dr. Ross concluded that the muzzle of the gun was in contact with the victim's skin. The victim also had many other contusions or bruises.

The ballistics testimony also belies Defendant's claim that the shooting was accidental. Agent Scott testified that Defendant's weapon could be fired two ways once it was loaded, single or double-action firing. It was his opinion that the "double-action trigger pull" would take approximately 15 pounds of pressure, which would "have to be applied with some intention." Concerning the single-action pull, Agent Scott did not believe "it would be accidental to cock the gun and actually pull the hammer back into that cocked position."

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's conviction for premeditated first degree murder. The jury was entitled to discredit Defendant's story of taking his gun to investigate an intruder outside of the house and then tripping on a flashlight or bowl when he came back inside causing the gun to discharge. Defendant is not entitled to relief in this appeal.

## B.  Admission of Autopsy Photographs

Defendant argues that two photographs, exhibits 43 and 46, of the victim taken at the time of the autopsy, which were introduced into evidence by the State, were so prejudicial as to deprive Defendant of a fair trial. The State initially offered twenty-eight photographs

for admission that were taken during the victim's autopsy. During a hearing out of the presence of the jury, Defendant objected to four of the photographs: exhibit 40, showing the gunshot wound to the victim's head; exhibit 43, showing bruises on the victim's legs; exhibit 46, a close-up of the gunshot wound to the victim's head; and exhibit 62, showing the fractures to the victim's skull.

Defense counsel noted that exhibit 43 was irrelevant because it showed bruising to the victim's legs when the sole cause of death was a gunshot wound to her head. The State argued that the photograph was relevant to show the condition of the victim's body and to support the allegations that the victim and Defendant had been fighting prior to the shooting, an allegation that Defendant denied during his interview with police. Concerning the three photographs of the gunshot wound to the victim's head, exhibits 40, 46, and 62, defense counsel argued that the prejudicial effect of the photographs outweighed the probative value. The State asserted that the photographs were necessary to show the size and extent of the wound and to assist the medical examiner in his testimony. The State also argued that they were necessary to show that it was a contact wound.

The trial court reviewed each photograph and found that exhibit 43 was admissible because it was potentially relevant to the issue of whether the victim and Defendant had been fighting. The court also noted that the photograph did not have any prejudicial effect whatsoever. Concerning exhibits 40, 46, and 62, the trial court noted that all three pictures had some relevance; however, the court excluded exhibits 40 and 62 because the prejudicial effect outweighed the probative value. The trial court found that exhibit 46 was admissible.

The admissibility of a photograph lies within the sound discretion of the trial court, and the trial court's ruling will not be overturned absent a showing of an abuse of discretion. *State v. Faulkner*, 154 S.W.3d 48, 67 (Tenn. 2005); *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). The photograph, however, must be relevant to an issue at trial. *State v. Braden,* 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); *See also* Tenn. R. Evid. 401 and 402. Defendant in the present case argues that the two photographs, exhibits 43 and 46, were irrelevant and "prejudicially cumulative." We have reviewed the photographs and conclude that they were clearly relevant. Photographs of a victim's injuries are relevant if the defendant admits he killed the victim but attempts to show it was an accident. *Banks*, 564 S.W.2d at 949. Defendant contested the manner in which the victim died, arguing that the shooting was accidental. The State may show through photographs "that greater force was used against the victim than is consistent with the defendant's account of the facts." *Id*. at 950.

"While it can be said that photographs of crime victims who suffer serious bodily injury are prejudicial by their very nature, a prejudicial photograph is not *per se* excludable."

*State v. Jordan*, 325 S.W.3d 1, 85 (Tenn. 2010). The prejudicial nature of a photograph of the victim rises to the level of unfairness if the photograph unduly suggests "a decision on an improper basis, commonly . . . an emotional one." *State v. Collins,* 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting *Banks*, 564 S.W.2d at 951). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror." *Collins*, 986 S.W.2d at 20 (quoting M. Graham, *Handbook of Federal Evidence*, 182-83 (2d. ed. 1986)).

We are unable to conclude that the trial court abused its discretion in ruling that the two photographs were relevant and that the probative value of the photographs in question was not substantially outweighed by the risk of unfair prejudice. The photograph of the bruising to the victim's legs, exhibit 43, was relevant to the issue of premeditation as to whether the victim and Defendant had been fighting prior to the shooting as testified to by Ms. Tackett, which Defendant denied in his statement to police. *See State v. McAfee*, 784 S.W.2d 930 (Tenn. Crim. App. 1989)(photograph of superficial injuries to the victim's face was admissible to show premeditation). We find, as did the trial court, that the photograph was in no way prejudicial. The photograph of the close-up of the entrance wound behind the victim's ear, exhibit 46, was clearly relevant to establish that Defendant shot the victim at close range and that the shooting was not accidental. The State noted that the photograph showed a "searing" wound, which was essential to show that it was a "contact gunshot wound." *See State v. Detrick Cole*, No. W2002-01254-CCA-R3-DD, 2003 WL 22848969 at *7-8 (Tenn. Crim. App. Nov. 4, 2003)(post-mortem photographs depicting close-ups of the victim's scalp which revealed a gray ring of soot around one wound indicating it was the result of a gunshot wound fired at close range were relevant to supplement the testimony of the medical examiner . . . , "from which a jury could infer premeditation, and not from a few feet away as claimed by the defendant during his statement to police.") The jury could infer that Defendant fabricated this story to conceal his crime. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE

-10-