IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

OCTOBER 1997 SESSION

FILED

March 3, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 03C01-9704-CR-00143 |
| Appellee, | * | HAMILTON COUNTY |
| VS. | * | Hon. Steven M. Bevil, Judge |
| JENNIFER COLLINS, | * | (Second Degree Murder) |
| Appellant. | * | |

For Appellant:

Larry J. Campbell, Attorney
605 Lindsay Street
Chattanooga, TN  37403

For Appellee:

John Knox Walkup
Attorney General and Reporter

Michael J. Fahey, II
Assistant Attorney General
425 Fifth Avenue  North, Second Floor
Cordell Hull Building
Nashville, TN  37243-0490

Barry A. Steelman
and
David W. Denny
Assistant District Attorneys General
Hamilton County District
  Attorney General's Office
600 Market Street, Suite 310
Chattanooga, TN  37402

OPINION FILED:_____

REVERSED AND REMANDED

GARY R. WADE, JUDGE

<u>OPINION</u>

The defendant, Jennifer Collins, was convicted of second degree murder. The trial court imposed a Range I sentence of fifteen years. In this appeal of right, the defendant raises the following issues:

> (I)  Whether the evidence is sufficient to support her conviction;
>
> (II)  Whether the trial court committed error by admitting autopsy photographs of the victim; and
>
> (III)  Whether the trial court should have classified her as an especially mitigated offender.

Because of the admission of certain of the photographs of the victim, which we have concluded are prejudicial and had little or no probative value, we must reverse the conviction and remand for a new trial. The factual issues presented at trial, especially those relative to the various degrees of homicide, are simply too close to allow for a harmless error adjudication.

In July of 1993, the defendant, who grew up in Copper Hill, Tennessee, and graduated from high school there in 1992, became pregnant by her boyfriend, Keith Crouch. Shortly thereafter, she was able to verify her condition by the use of a home pregnancy test. The defendant, who held a summer job at the time of conception, did not reveal her condition to family or friends and told her boyfriend that she had aborted the pregnancy. In August of 1993, the defendant returned to the University of Tennessee at Chattanooga and moved into a four bedroom campus apartment with three other female students. By wearing loose clothing, the defendant, who was five feet ten inches tall with a slender build, was able to hide her pregnancy from her roommates. She sought no prenatal care.

During the late evening hours of Saturday, April 9, and the early

morning hours of Sunday, April 10, 1994, the defendant, nineteen years old at the time, went into labor. She left her bedroom and went into a small bathroom containing only a commode and bath and separated from the vanity area. At about 9:00 A.M., when the defendant began to scream and cry because of her pain, one of her roommates, Twyla Fuller, was awakened and offered help. Later, Michelle Robertson was awakened. Twice the defendant asked for towels and opened the door slightly. Later, she asked for and received a pair of scissors, shortly after which she opened the bathroom door and collapsed to the floor. There was blood throughout the bathroom. The toilet lid was shut and was draped with a towel. There were two male house guests, Marcus Standipher and Alexander Booker, who had stayed in the apartment throughout the weekend.

The defendant's roommates were unable to acquire assistance from a nurse at a "small hospital" across the street from the apartment. After several minutes, they returned to their apartment and called 911. When paramedics arrived and questioned the defendant, who was still lying in the doorway of her bathroom, she denied the possibility of being pregnant. Upon examination, the paramedics observed that the defendant had poor vital signs. When lifted to a chair, she suffered a seizure and lost consciousness. After being revived and upon further inquiry by the paramedics, the defendant acknowledged that she was pregnant. Paramedic Glenn King, who suspected a miscarriage, lifted the lid of the closed toilet searching for fetal tissue. He discovered a full-term infant who showed no signs of life.

An autopsy by the county medical examiner determined that the infant victim, who weighed seven pounds and two ounces, had lived at least two minutes. Drowning was deemed to be the cause of death.

3

The theory of the state can best be described in a question propounded to Dr. Fred King, the Hamilton County Medical Examiner:

> And, Dr. King, with regard to hypotheticals, would your findings be consistent with a hypothetical situation in which a mother was sitting upon a commode and did not lose consciousness, but the baby was born from the mother and the mother watched the baby go into the commode and the baby drowned there in the commode?

The answer was that it "would be physically possible...."

The theory of the defense is best described in its hypothetical question to Dr. King:

> A woman seated on the commode feels the birth process start, never having experienced it before, panics, and basically faints or passes out leaning against the wall to the side, sitting there on the commode. The birth process continues, the baby gets out of the birth canal, at that time the baby starts gulping for air .... The baby takes two, three gulps.... [T]he birth process is finished. The baby is dropped in the water, the mother here [is] still passed out. The baby is still going to gulp, isn't it?
>
> A.    Yes.
>
> Q.    That's where the fresh water could come from, isn't it?
>
> A.    Yes.
>
> Q.    Doctor, did that hypothetical fit your autopsy?
>
> A.    Yes, that would be a possibility.
>
> Q.    Thank you doctor. Even to the bump on the head, wouldn't it, doctor?
>
> A.    The [small] hemorrhage on the back of the head could be caused by the baby's head hitting against the toilet bowl as it was delivered, that would be a reasonable explanation for that impact, yes.

The defense offered no proof. Thus, all of the evidence at trial was introduced through the state. Ms. Fuller, who was the first of the apartment

4

occupants to be awakened by the screams, testified that the defendant was "crying" and "hysterical." She recalled asking Booker what had happened and his response was that the defendant had been "up and down all night." Ms. Fuller recalled that she did not look inside the bathroom because she thought the defendant was vomiting. She remembered intermittent periods of quiet. Ms. Fuller awoke Ms. Robertson just before the defendant asked for scissors and remembered that it was only when she insisted that the door be opened, saying "You're scaring the hell out of me," that the defendant emerged from the bath and toilet area of the bathroom and fell to the floor. Ms. Fuller recalled that there was "blood everywhere."

Ms. Fuller and Standipher sought help from the medical clinic across the street from their apartments but returned to their room to call 911 when no one agreed to help. At trial, Ms. Fuller recalled that the defendant, who was still lying in the floor of the bathroom area, said that she did not want to go to the hospital. Ms. Fuller testified that it was several minutes before the paramedics arrived and recalled that the defendant experienced a seizure and convulsions after the initial treatment was begun. She testified that the paramedic asked the defendant whether she was pregnant and remembered that the defendant provided an affirmative response. Ms. Fuller described the defendant as "white," "weak," and "too bad off" to respond to questioning, claiming she could "hardly talk." She said she thought the defendant "was going to die."

Ms. Fuller testified that the defendant, who was tall and slender, usually wore men's shirts and baggy khaki shorts. She said the defendant took exercise class, went to a tanning bed, and generally conducted herself like any student. She acknowledged that the defendant had consumed beer with her and the others on the Friday night before the Sunday morning incident but not enough to

5

"get drunk."

The proof established that the defendant did not feel well on Saturday, was nauseous for much of the evening, and did not go out with the others. While Michelle Robertson generally agreed with the testimony of Ms. Fuller, she did testify that it was her belief that the defendant consumed enough beer to become intoxicated on the previous Friday night. She remembered that the defendant, while awaiting the ambulance, asked, "What I am going to tell my mom?"

Glenn King, a paramedic with the Hamilton County Emergency Medical Services, found the defendant lying in the doorway between the commode area and vanity area of the apartment's bathroom. He recalled that the defendant reported abdominal and lower back pain but initially denied being pregnant; upon further questioning, however, she acknowledged her pregnancy. King remembered that when he tried to place the defendant in a chair, she began to have seizures, most likely from a lack of oxygen to the brain. Upon learning from the defendant that she last had a period in July, King looked in the toilet and saw the victim, who appeared to be dead, with her face down in the commode water.

Paramedic King testified that a body typically contained eight units of blood and that the defendant ultimately received four units by transfusion at the hospital. It was his opinion that the blood loss was due to an unclamped, severed umbilical cord which typically contains several arteries.

King's partner, Gregory Roberts, recalled that the defendant's bleeding had subsided by the time of their arrival. Roberts testified that the paramedics arrived ten to twelve minutes after their call. He remembered that the defendant first

6

denied any possibility of pregnancy and then acknowledged her condition only after further questioning.

Donald Roden, who was also a Hamilton County paramedic, and his partner, Ryan McNabb, were contacted to serve as backup and to recover the victim. Roden described the defendant's condition as critical, involving seizures and unconsciousness. He observed the defendant being carried from the apartment unit to the ambulance. Roden observed bloody towels on the floor of the bathroom. He described the victim as full-term with a clean face but with a waxy coating on the rest of her body. None of the paramedics believed there was reason to attempt to resuscitate the victim.

Officer Kenneth Taylor of the University Police arrived at the scene with the first paramedics at approximately 9:45 A.M. While describing the defendant as alert and conscious, Officer Taylor also observed the defendant experience a seizure. He remembered the defendant acknowledge to the paramedics that she was pregnant. Officer Taylor discovered scissors in the bathroom and cleaned the sink before contacting the Chattanooga Police Department. In his police report, he described the incident as a "negligent homicide."

Vounett Weidner, a nurse at Erlanger Hospital, was involved in the treatment of the defendant. She estimated the blood loss at two units before doctors removed the placenta. She acknowledged, however, that the defendant received two units on the date of her admission to the hospital and two more units on the next day. Nurse Weidner saw the body of the victim and offered to show her to the defendant, who declined. She described the defendant as having third degree lacerations as a result of the childbirth and testified that a fourth degree

7

laceration was the worst possible. She stated that the defendant was treated for a life-threatening condition known as eclampsia, defined as a coma or convulsions associated with the pregnancy, and recalled that the defendant had another seizure on the night of her admission.

Dr. King, a clinical pathologist and the medical examiner for Hamilton County, issued both a certificate of live birth and the death certificate for the victim. In conducting an autopsy, Dr. King found air in the stomach and lungs of the victim, indicating that the victim had drawn several breaths of air and had lived "at least a couple of minutes" before drowning. He found clear water in the stomach indicating swallowing near the time of death. Dr. King also found that the incisions in the umbilical cord had caused some redness, indicating that the victim was alive at the time the incisions were made. He determined that there was some hemorrhaging in the lungs and minor hemorrhaging on the back of the head, indicating contact with a blunt surface such as a commode. Dr. King found some amniotic fluids in the lungs of the victim which, he said, indicated that the nose and mouth had not been cleared after the birth; he described the clearing process as important for the victim to be able to breathe freely. Dr. King indicated that that amount of amniotic fluids present was insufficient to have caused death. He determined that the victim weighed seven pounds and two ounces and after a conference out of the presence of the jury, identified six photographs of the victim and portions of the umbilical cord:

> The pictures show what the baby looked like, the size, but there is really nothing on the external exam of the infant that I think is confusing.

Two autopsy photographs of the deceased victim were shown to the jury. On cross-examination, Dr. King conceded that he deemed the manner of death as "undetermined" as to whether it was a homicide or an accident. "The

8

manner of death is difficult [to assess] from a medical point of view."

Dr. Carol Iddins, an obstetrician and gynecologist, acknowledged that the defendant was treated for eclampsia, a very serious medical condition. It was her opinion, however, that the defendant did not suffer from that affliction because there was an absence of protein in her urine. Dr. Iddins, who removed the placenta, described the defendant as awake and alert when she was first seen at the hospital.

Detective Charles Dudley of the Chattanooga Police Department questioned the defendant about five hours after her surgery. He recalled that the defendant had confirmed her pregnancy several months earlier with a home pregnancy test and had not sought prenatal care. She claimed that she planned to give up the baby for adoption. He remembered the defendant saying that she was in "self-denial" and "lived normally" believing that the "problem would just go away." He testified that the defendant recalled drifting in and out of consciousness while she sat on the commode for several hours suffering severe stomach pains. He said that the defendant remembered losing consciousness, awaking, and being unable to move, apparently because of the weight of the victim who was still attached to the umbilical cord. She said that the child was not moving, "it was horrible; I didn't want [my roommate and friends] to see it." Detective Dudley reported that the defendant recalled asking for scissors, cut the umbilical cord, and observed that the victim was a female and had hair. He remembered the defendant stating that she was in a weakened condition and lost consciousness as she opened the door seeking help. Detective Dudley described the defendant as "very cooperative" throughout the interview.

9

I

Initially, the defendant claims that the evidence was insufficient to support a verdict of second degree murder. She argues that the Hamilton County Medical Examiner declined to classify the case as a homicide and acknowledged that the death of the victim could have been accidental.

On appeal, however, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). A conviction can be set aside only when the reviewing court finds that the "evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e).

Second degree murder is defined as "a knowing killing of another." Tenn. Code Ann. § 39-13-210. It does not require premeditation. Id. Thus, in order to support a second degree murder conviction, the state must only establish that the killing was knowing beyond a reasonable doubt. See State v. Summerall, 926 S.W.2d 272 (Tenn. Crim. App. 1995). The crime of second degree murder can be established by circumstantial evidence. See, e.g., State v. Driver, 634 S.W.2d 601 (Tenn. Crim. App. 1981). A parent who elects not to seek medical assistance for his infant child may be convicted of second degree murder where there is proof that the victim's "deterioration [is] evident and the need for medical attention [] apparent." State v. Bordis, 905 S.W.2d 214, 226 (Tenn. Crim. App. 1995). The defendant must have "an awareness 'that the conduct [was] reasonably certain to have caused the

10

result.'" Id. (quoting Tenn. Code Ann. § 39-11-302(b)) (alteration in original).

Here, it was the state's theory that the defendant, because of an unwanted pregnancy, willfully and intentionally chose not to seek prenatal care and elected against medical assistance during the delivery of her child. There was proof offered by the state that the defendant hid her condition from her parents, her roommates and her friends, and caused the drowning death of the victim by cutting her own umbilical cord as she sat on her private commode. The defendant failed to inform either her roommates or paramedics that she had delivered a full-term child while seated on the toilet.

The jury chose to accredit this circumstantial evidence supporting the theory of the state. That was their prerogative. In our view, a rational trier of fact could have found the essential elements of the crime of second degree murder beyond a reasonable doubt. In his role as thirteenth juror, the trial judge, while describing the case as among "the most tragic ... I've ever seen," nonetheless confirmed the presence of all elements necessary for a second degree murder conviction. Thus, the evidence of the defendant's guilt satisfies the standards of review. See Jackson v. Virginia, 443 U.S. 307 (1979).

II

The defendant next complains that the trial court erred by admitting autopsy photographs of the victim. Exhibits 12 through 17, all of which were identified by Dr. King out of the presence of the jury, are best described as follows:

> Exhibit 12 is a color photograph taken at the morgue and depicting a fully developed, discolored infant and a portion of the umbilical cord.

> Exhibit 13 is essentially the same photograph with the umbilical cord moved away from the blood-covered

11

genital area.

Exhibit 14 is a similar photograph taken this time of the back side of the victim.

Exhibit 15 is a close-up of the face and chest areas of the victim.

Exhibit 16 is a photograph almost identical to Exhibit 14.

Exhibit 17 is a color photograph taken of the deceased victim as she lay on her right side wrapped in her umbilical cord, showing discoloration of the body, and a very dark reddish-colored substance in and around the legs and buttocks.

Exhibit 11, a photograph not challenged by the defendant, is a close-up color photograph of a portion of the umbilical cord indicating the point of incision and another point of an attempted incision. The umbilical cord has a flesh color with the reddish areas indicating hemorrhaging near the points of incision. In a case involving similar circumstances, this court observed that a single photograph of internal organs of a child victim, while unpleasant, was helpful in understanding the testimony of the medical examiner who performed the autopsy. State v. James Dubose, No. 01C01-9405-CC-00160, slip op. at 20 (Tenn. Crim. App., at Nashville, Aug. 25, 1995), aff'd on unrelated issue, 953 S.W.2d 649 (Tenn. 1997). In that regard, Exhibit 11 was probative to establish not only that the defendant had intentionally cut the umbilical cord, a fact not in question, but also to show signs of hemorrhaging, indicating that the victim had a few moments of life prior to drowning.

Rule 403 of the Tennessee Rules of Evidence provides as follows:

**Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

12

Photographs made during or after an autopsy should be scrutinized and examined prior to being shown to the jury. Dubose, slip op. at 20; see generally State v. McCall, 698 S.W.2d 643 (Tenn. Crim. App. 1985). If other considerations substantially outweigh the probative value of the evidence, it should be excluded. In State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978), our supreme court recognized "the inherently prejudicial character of photographic depictions of a murder victim...." In adopting Federal Rule of Evidence 403 as its test for admissibility, the court suggested a variety of factors for consideration by the trial judge. The "value of photographs as evidence, ... their accuracy and clarity ... whether they were taken before the corpse was moved ... [and] the inadequacy of the testimonial evidence in relating the facts to the jury" are appropriate factors. Id.

The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly ... an emotional one." Banks, 564 S.W.2d at 951 (quoting Advisory Committee Note to Federal Rule of Evidence 403). One authority characterizes evidence that is unfairly prejudicial as that designed to appeal to the sympathy, sense of horror, or instinct to punish. J. Weinstein and M. Burger, Weinstein's Evidence Manual 6-20 to 6-21 ((Student ed. 1987).

The issue, in our view, is one of simple fairness. Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror." M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986). Murder is an absolutely reprehensible crime. Yet our criminal justice system is designed to establish a forum for unimpaired reason, not emotional reaction. Evidence which only appeals to sympathies, conveys a sense of horror, or engenders an instinct to punish should be

13

excluded. Weinstein and Berger, supra, at 6-20 to 6-21.

Here, the jury considered evidence of second degree murder, reckless homicide, and criminally negligent homicide. During argument by counsel out of the presence of the jury, the trial court made the following observations about the photographs the state sought to introduce:

> The courts tend to limit introduction of photographs, especially in cases of homicide ... that would be gory, that would be inflammatory in and of themselves. This jury has heard evidence, ample evidence describing this baby [and] ... there is no question, at least at this time there should be no question in the jury's mind that this was a baby.... [A]t this point in time, the court has heard ... nothing to indicate that the defendant did not know that she had a baby.... I don't know that they add anything to the doctor's testimony, however, they may become relevant at some later time in the course of the trial.... I don't think they clarify the issue anymore to the jury than has already been testified to by Dr. King.... [I]f they help illustrate a point that he has testified to and illustrative of the testimony or clarify that testimony, then I will allow one or some of these photographs....

After making these remarks, the trial judge asked Dr. King if the photographs would assist the jury beyond the extent of his testimony or clarify his testimony. Dr. King answered that "[t]he pictures would show what the baby looked like, the size, but there's really nothing on the external exam of the infant that I think is confusing."

The primary issue was whether there was a knowing killing by the defendant, which is a necessary finding for a second degree murder conviction. Neither the viability of the victim nor that death was due to drowning were disputed issues. The evidence offered by the state after the initial ruling by the court did not raise questions that needed to be answered by the presentation of the two photographs admitted or, for that matter, any of the exhibits 12 through 17 as identified in the record.

After a recess, however, the trial court reversed its ruling:

> I think it's important for the jury to see the size of this baby in the consideration of whether or not the defendant at the time this baby died, whether or not the defendant knew that she delivered and that this child died ... and that she had knowledge of it at that time. So for that purpose, I am going to reverse my previous decision, I'm going to allow the jury to see Photograph Number 16 and Photograph Number 12, which shows a front view ... of the infant and a back view of the infant. And I think it's important for them to see the size, that this is a full-term baby. You can talk about seven pounds and six ounces, I don't have any concept what seven pounds and six ounces is as opposed to eight pounds and three ounces, I can't picture that in my mind, but when I look at these photographs and I see this is a seven pound, six ounce baby, I can tell more what a seven pound, six ounce baby ... is.

In People v. Burns, 241 P.2d 308, 319 (Cal. App. 1952), an appeals court ruled that the trial court abused its discretion in admitting autopsy photographs which served only to inflame the jury, noting the "line was crossed in this case." In Arizona, a manslaughter conviction of a seventeen-month-old child was reversed due to the admission of photographs of his nude, bruised corpse. State v. Beers, 448 P.2d 104, 109 (Ariz. App. 1968). In Berry v. State, 718 S.W.2d 447 (Ark. 1986), the Arkansas Supreme Court made the following statement:

> Other states have been ... liberal in the admission of similar photographs where they were relevant to proof of the state's case. Like we do now, many have found it necessary, however, to stem the resulting influx of inflammatory pictures where the claims of relevance were increasingly tenuous in light of the prejudicial nature of the photographs.

Id. at 450.

There is an increasing concern that courts are becoming too liberal in their admission of inflammatory autopsy photographs:

> Prosecutors as well as trial courts must exercise their discretion in the use of gruesome photographs. The statement that "the State had the right to prove its case

15

> up to the hilt in whatever manner it chose," must be read to mean only that the State may present ample evidence to prove every element of the crime.... Prosecutors are not given a carte blanche to introduce every piece of admissible evidence if the cumulative effect of such evidence is inflammatory and unnecessary.

Id. at 451 (quoting State v. Crenshaw, 98 Wash. 2d 789, 659 P.2d 488 (1983)) (omission in original).

As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted. See State v. Duncan, 698 S.W.2d 63, 69 (Tenn. 1985). In State v. Cynthia Roberson and Rhodney Roberson, No. 02C01-9503-CC-00059 (Tenn. Crim. App., at Jackson, Dec. 28, 1995), an autopsy photograph showing the cranial bone of the victim should have been excluded because the probative value was substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 951. In Roberson, the court observed, "we are unable to say that the undue prejudicial effect of this gruesome photograph did not affect the jury's findings of guilt." Roberson, slip op. at 14.

In our view, the inherent prejudice of admitting color photographs of a bruised, bloodied, nude, infant victim is apparent. The size of the child was not in dispute. No issue was made about whether the baby was full-term. The medical testimony was undisputed as to that. That there had been a live birth was also uncontested. Dr. King presented unchallenged medical evidence that the air and water in the lungs established that the victim drew several breaths before drowning; there was hemorrhaging of the umbilical cord. Thus, the photographs were not probative at all. While the size of the victim may have been marginally relevant, that fact was not in dispute and had been established by the testimony. In our assessment, the prejudice substantially outweighed any probativeness. Banks, 564

16

S.W.2d at 951; see also Gladson v. State, 577 S.W.2d 686 (Tenn. Crim. App. 1978).

Moreover, we cannot classify the error as harmless. While the evidence was sufficient to establish second degree murder, there was also evidence of reckless and negligent homicide, each of which the trial court charged to the jury. The state placed emphasis on one of the photographs during final argument:

> You've seen the picture, and I've showed it to you again, you can look at it in the jury room if you choose to, but we're talking about Brittany Nicole Collins, the baby girl whose body is in that picture.

The record demonstrates that the jury, which had deliberated for about three hours before returning with a question for the court, gave careful consideration to the various degrees of homicide possible:

> We need a clarification of condition two under the definition of knowing.

Thereafter, the jury considered the matter for more than two hours before returning with its verdict of second degree murder. Because of the difficult factual issues separating murder and reckless or negligent homicides, a verdict may often depend upon a single item of evidence; in consequence, we are hesitant to classify this error as harmless in the context of the trial. A reading of the entire record of this trial demonstrates the closeness of the issues. See Gladson, 577 S.W.2d at 687 (a new trial was ordered where the court could not conclude the "pictures did not inflame the jury to a degree" that they did not consider the lesser offense). The disputed photographs may have made a difference.

This is a close question. In Dubose, slip op. at 11, this court found an autopsy photograph of a sixteen-month-old victim to be admissible; in our view, the facts are distinguishable from those presented in this case. In Dubose, the victim

died of a massive abdominal trauma which ruptured the intestines. The photograph

was introduced to support a pathologist's assertion that sixty percent of the victim's

blood had accumulated in the abdominal cavity as a result of the rupture. The

photograph was allowed only because of the importance of establishing the cause

of death. Id. In contrast, the photographs in this case had no additional probative

value.


III

Because the defendant was convicted of a Class A felony, neither

probation nor any other alternative sentence was an option.[1] The defendant insists

that she should have been classified as an especially mitigated offender on the

following grounds:

> (1) the defendant has no prior felony convictions; and
>
> (2) the court finds mitigating but no enhancement factors.

Tenn. Code Ann. § 40-35-109.


If found to be a mitigated offender, the defendant is entitled to a

reduction of ten (10%) percent from the minimum Range I sentence or a reduction in

---

[1]We notice the jury was given the following instruction on sentencing:

> The jury will not attempt to fix any sentence at this time. However, you may weigh and consider the meaning of a sentence of imprisonment.
> The range of punishment ... for ... second degree [murder] is ... [15] to 25 years. ...[T]heir earliest release eligibility date is: 2.95 years.
> The range of punishment ... for ... reckless homicide is ... [2] to 4 years.... [T]he earliest release eligibility date is: 0.39 years.
> The range of punishment ... for ... criminally negligent homicide is ... [1] to 2 years, ... [T]he earliest release eligibility date is: 0.20 years.

In State v. Jerry Ray Cooper, No. 01C01-9604-CC-00150 (Tenn. Crim. App., at Nashville, Nov. 17, 1997), a majority of the panel found this type of instruction unconstitutional. Our supreme court is reviewing this issue in State v. Howard E. King, No. 02C01-9601-CR-00032 (Tenn. Crim. App., at Jackson, Oct. 22, 1996), app. granted, (Tenn., Mar. 10, 1997). Such instruction should be avoided at the new trial.

the release eligibility date up to twenty (20%) percent of the sentence, or both.

The defendant, age nineteen at the time she gave birth to the victim, was twenty-one at the time of trial. By then, she had completed two years of study at the University of Tennessee at Chattanooga and attended Cleveland State majoring in psychology. After this incident, she was diagnosed with "major depression," prescribed medication, and began psychological treatment. The defendant has been incarcerated since her trial in November of 1995.

The defendant has a younger sister. Her parents have been divorced for several years and her father has remarried. The defendant was reared in the primary custody of her mother, has a close relationship with her, and yet insisted her mother remain absent from the trial to "spare her feelings." An active member of the Williamston United Methodist Church, the defendant was an active honor student in high school, a cheerleader, and a member of the dance team. She has held several jobs during the course of her schooling and has been described by employers as "quiet, pleasant, and shy" and "extremely trustworthy."

As noted by the trial judge, there were numerous supportive letters for the defendant from the Copper Hill community. Her pastor, her church, teachers, Polk County authorities, former employers, friends, and her extended family have been supportive. Some have encouraged leniency and others have insisted that, despite the defendant's acknowledgment that she was wrong to act as she did, the defendant lacked criminal culpability for the incident.

Here, the trial court, while generally acknowledging the presence of mitigating factors, also found an enhancement factor; that is, that the victim was

particularly vulnerable because of her age or physical or mental disability.  Tenn. Code Ann. § 40-35-114(4).  The state bears the burden of proving that a victim is particularly vulnerable.  State v. Poole, 945 S.W.2d 93 (Tenn. 1997); State v. Adams, 864 S.W.2d 31 (Tenn. 1993).  Proof of age, standing alone, may be insufficient to establish particular vulnerability.  State v. Hayes, 899 S.W.2d 175 (Tenn. Crim. App. 1995).

In Hayes, however, this court ruled that evidence that the victim was unable to resist, unable to summon help, or unable to testify against the perpetrator, would indicate particular vulnerability.  Id. at 185.  There was evidence of that in this case.  Findings of fact made in the trial court are conclusive on this court unless the evidence preponderates otherwise.  Graves v. State, 512 S.W.2d 603, 604 (Tenn. Crim. App. 1973).  By the use of these guidelines, we must hold that there was evidence to support the application of the enhancement factor.  Thus, the trial judge, who was clearly touched by the perplexity of the circumstances, had a reasonable basis for denying especially mitigated offender status.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

_____
Gary R. Wade, Judge

CONCUR:


_____
David H. Welles, Judge


_____
Jerry L. Smith, Judge

20