FILED

04/27/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 15, 2016 Session

**STATE OF TENNESSEE v. RICKY THOMPSON**

**Appeal from the Criminal Court for Knox County**
**No. 104175          G. Scott Green, Judge**

**No. E2015-02464-CCA-R3-CD**

Defendant, Ricky Thompson, appeals from his conviction for reckless aggravated assault, arguing that the trial court abused its discretion when it failed to declare a mistrial after a potential juror made highly prejudicial remarks that undermined the authority of the trial proceedings and contaminated the rest of the venire. Additionally, Defendant argues that the trial court abused its discretion when it admitted photographs of surgical procedures performed on the victim. Following our review, we conclude that the trial court properly exercised its discretion in denying the Defendant's motion for a mistrial. Additionally, we conclude that the surgical photographs were improperly admitted into evidence but find the error to be harmless. Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., J. joined. D. KELLY THOMAS, JR., J., filed a dissenting opinion.

Gerald L. Gulley, Jr. (on appeal) and Scott C. Frith (at trial), Knoxville, Tennessee, for the appellant, Ricky Thompson.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Charme P. Allen, District Attorney General; Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## FACTUAL BACKGROUND

This case arose after a physical altercation between the Defendant and the victim, Nathaniel Drew, on May 31, 2014. The victim suffered injuries to his face that resulted in extensive surgeries and a two-week long hospital stay. The Knox County Grand Jury charged Defendant with one count of aggravated assault and one count of aggravated robbery. *See* T.C.A. §§ 39-13-102, -402. The case proceeded to a jury trial on September 8, 2015.

### *I. Voir Dire*

During voir dire, the following colloquy occurred between the trial court, counsel for Defendant, and Tom Miller, a member of the venire:

THE COURT: Is there anything else any of you feel like you need to bring to the attention -- yes, sir? Mr. Miller?

MR. MILLER: Just prior to being carjacked, burglarized, raped, beaten, and tortured, humiliated, Chris Newsom had just left our house. And I agree wholeheartedly with Gary Christian[1] when he says the court system is flawed, and is an advocate for the guilty and does nothing for the victim. And that's the way I feel and my mind is focused on him today. Is this young man over here guilty? Based on where he's at, yeah, I think he is.

COUNSEL FOR DEFENDANT: Your Honor, I object.

MR. MILLER: Well, I'm just saying -- I mean, that's what you brought us up here -- you said say what's on your mind. That's what I'm saying.

THE COURT: You think maybe if you were in [Defendant's] position you would want a juror with a little bit different mindset than what you've got?

MR. MILLER: I would think I would want somebody with a totally different mindset than what I've got.

---

[1] We assume that Mr. Miller is referring to the case involving the kidnapping, robbery, rape, and murder of Channon Christian and Christopher Newsom in Knoxville, Tennessee, in January 2007. Gary Christian is Channon Christian's father. There were four defendants in that case: Lemaricus Davidson, George Thomas, Letalvis Cobbins, and Vanessa Coleman. *See generally State v. Davidson*, 509 S.W.3d 156 (Tenn. 2016); *State v. Letalvis Darnell Cobbins*, No. E2013-00476-CCA-R3-CD, 2014 WL 4536564, at *12 (Tenn. Crim. App. Sept. 12, 2014), *no perm. app. filed*.

THE COURT: All right. I'm going to allow you to be excused for cause, Mr. Miller. Thank you for your candor.

Counsel for Defendant objected to Mr. Miller's comments and made a motion for a mistrial. The trial court denied his motion and made the following comments to the potential jury members:

[Mr. Miller] was speaking his mind. This is the process by which we speak our mind. Anybody else feel that way? All right. I'm going to remind you again, just because they accuse somebody doesn't mean they've done anything. He may or may not be guilty of anything. We don't know yet. But he is presumed at this point to be innocent. Every one of us carry that presumption with us.

*II. Trial*

At trial, the victim testified regarding the incident with Defendant. The victim lived in an apartment at the Walter P. Taylor Homes ("Walter P.") and had known Defendant for approximately one year. Defendant's mother lived at Walter P., and Defendant occasionally stayed with her there. The victim and Defendant spent a lot of time together, and they "would sit, drink, smoke weed, . . . [and] drink beer all day." The victim further explained that "[j]ust about every day[,]" he gave Defendant "beer and weed." In the past, Defendant had asked the victim to borrow money, but the victim refused. On occasion, the victim gave Defendant money to purchase beer for the two of them to drink together. Defendant would go to the market, purchase beer, and return to the victim's apartment at Walter P.

The victim discussed the details of the day of the attack on May 31, 2014. He explained that his aunt was his "overseer" and wrote him a check every month. That day, she took him to the bank, and he cashed a check for $350. He purchased some cleaning supplies and "went out to eat." On the way home, he stopped and bought two cases of beer. He returned home with the remainder of the cash and bundled it into a "dummy bankroll." The victim had requested that part of his check be cashed as one-dollar bills, so that he when he rolled the cash together, he appeared to have a "big bankroll." The victim explained that he did this because he liked to gamble. That evening, the victim testified that he showered around 8:30 p.m. or 9:00 p.m. and waited on a cousin to arrive and take him to the "Old City."

The victim did not remember the exact time that Defendant arrived at his apartment that evening, but he claimed that it was some time after he showered and was waiting on his cousin. When Defendant arrived, the victim was sitting on a couch in his living room counting his money. Defendant knocked, identified himself, and the victim

told him to "come on in." Once inside, Defendant demanded that the victim give him a beer, but the victim refused, saying, "I can't give you a beer every day." While talking to Defendant, the victim walked into the kitchen and retrieved a beer from the refrigerator for himself. According to the victim, as he was getting a beer, the following events transpired:

> [Defendant] hit me. I went up against the concrete wall. I hit my head. Hit the concrete wall. And I said, "Ah, hell." And I tried to wrestle him, but he was hitting me, but he's bigger than me, so I was reaching. I remember . . . grabbing for a knife. I remember grabbing a knife and I just started swinging, and that's all I remember.

When asked if Defendant said anything during the attack, the victim stated, "[H]e was just hitting me. . . . I was trying to dodge it the best I could, but he got the best of me." The next thing the victim claimed he remembered was hearing his cousin say, "Wake up." He was not sure if he was in his apartment or if he was in the hospital when this occurred.

Additionally, the victim testified that he did not remember exactly what he did with the money he was counting when Defendant entered his apartment. The victim stated that while in the hospital he had no money, and he claimed that he never found the money that he had been counting. He claimed that the last time he saw his money "[i]t was in [his] hand at the refrigerator" when he attempted to retrieve a beer.

The victim confirmed that he was intoxicated on the evening of the attack. He further admitted to using cocaine and marijuana regularly, and he stated that he drank "beer constantly, 24/7." Regarding May 31, 2014, he averred that he "was high, [he] was drinking[,]" and that the last time he used drugs was "[t]hat day[, t]hat night." Though he admitted to being intoxicated on the evening of May 31, 2014, the victim insisted that he was coherent: "I understood what I was doing. I [was] in my apartment [.] I'm always knowing what I was doing [sic]."

In addition to describing the attack, the victim also discussed his resulting injuries. He was admitted to the hospital on May 31, 2014 where he underwent two facial surgeries and remained in the hospital for "[fifteen] or [sixteen] days." The victim was shown a collective exhibit of photographs taken of his face after he was released from the hospital. He identified a photograph of his face and explained that it was "a picture of [his] face and [his] head where [he] had the staples where they cut [him] and did surgery[.]" He further explained that the photograph depicted his "neck where they cut [him] around [his] throat." The victim said that he "had surgery and staples all in [his] head." While testifying, the victim displayed a scar from the surgery under his chin.

Also, the victim identified photographs that showed markings on his face from the attack: "That's . . . my face and where I had been badly beaten." When asked if he had stitches he said that he "had stitches all in [his] eye, up under [his] throat, and [around] both eyes." When asked to explain the extent of his injuries, the victim stated, "[Defendant] crushed everything - - everything in my face was crushed. And [the doctor] had to do [twenty-nine] hours of surgery on me." Following the surgeries, the victim explained that he had "two metal rods [in his face]" and that these metal rods were to remain permanently. The victim testified that he still had pain associated with the injuries and claimed that he had "numbness all the time in [his] face[.]" The victim claimed that "[he could] tell if it [was] gonna rain or whatever. It just hurt[] constantly." Regarding his vision, he was required "to go see a doctor . . . because . . . [he could] see blurred but [he] just [could not] see plain." Prior to the incident with Defendant, the victim did not have any problems with his vision. The victim returned to the doctor regarding his facial surgery multiple times and incurred significant medical expenses.

On cross-examination, the victim reiterated that his "memory stop[ped] when [Defendant] hit [him] and [Defendant] continued to hit [him] and hit [him] and hit [him]." He agreed that he "reached for a knife trying to defend [himself]." He remembered that he was "trying to fight [Defendant] off [him]."

Officer Thomas Turner, a patrol officer for the Knoxville Police Department, testified that on May 31, 2014, he responded to the victim's apartment at Walter P. at "approximately two in the morning." He stated that the victim was conscious but "laying [sic] on the floor, [he] appeared to be beat up." There was some blood on the floor near "where [the victim's] head was." Officer Turner said that the victim "appeared to have some sort of cut at his hairline. There was blood in his hair. His face was swollen. It looked like his nose had been broken." Officer Turner found the victim alone in his apartment. The call originally came in as a stabbing incident, and the victim was able to inform Officer Turner that he had not been stabbed. Officer Turner searched the apartment for a knife, but he never found one. Police officers also searched the area immediately surrounding the victim's apartment, but they were unable to locate a knife.

Officer Turner saw Defendant shortly after arriving at the victim's apartment. He explained that another officer "encountered [Defendant] on the street and brought him back as a possible suspect." Officer Turner observed Defendant's hands and noticed that "the knuckles were bleeding and cut, and swollen, and he also had a slight cut on his arm and shoulder area." Officers asked Defendant what happened, and Officer Turner explained that "[Defendant] initially stated that he fell" but "later told [the officers] that he was stabbed by the victim." When asked if Defendant appeared to have a stab wound, Officer Turner responded, "The wound on his shoulder could have been from a knife, it was not deep, it didn't require medical attention. It didn't appear to be a stab wound, but

maybe a cut." Officer Turner stated that medical personnel checked Defendant's hands and shoulder, and "[Defendant] made statements that he did not need medical attention."

When asked if Defendant explained how he acquired his injuries, Officer Turner responded,

> Originally . . . [Defendant] said [that] he fell. He later recanted his story, and at the end of it we kind of determined that his story was that [the victim] had stabbed him after a complaint had arisen over alcohol. [Defendant] alleged that [the victim] had stabbed him, in which case [Defendant] then started hitting [the victim] in self-defense.

Once Defendant was placed in handcuffs, Officer Turner stated that Defendant "asked if he could give money that he had in his pocket to his mother who was on the scene and [Officer Turner] told him yes." When asked to give a description of the money, Officer Turner explained that "[i]t was just one grouping of money. [He didn't] recall if it was rolled or folded or what, but it was just one grouping of money [Defendant] took out of his pocket and gave to his mother."

On cross-examination, Officer Turner confirmed that he did not see the fight. After receiving a call to investigate a stabbing, Officer Turner went directly to the victim's apartment. Officer Turner agreed that he entered the victim's apartment and found the victim "[i]mmediately inside the door laying [sic] in the floor on the kitchen. Just -- that door opens to the kitchen."

Officer Richard Derrick White, who worked for the Knoxville Police Department, testified that on May 31, 2014, he responded to a call that "somebody had been cut" by a knife in the parking lot at Walter P. The State introduced a video of Officer White's encounter with Defendant taken from a recording device in Officer White's patrol vehicle, and Officer White referenced this video throughout his testimony. Officer White encountered Defendant on Martin Luther King Boulevard and observed that Defendant "was intoxicated[,]" "slurring his words[,]" and "had blood on his shirt and on his hands that appeared to be from an altercation." Officer White stated that he observed blood on Defendant's left shoulder, and Defendant initially told him that he cut himself on a piece of glass. Officer White also testified that Defendant explained that the altercation with the victim resulted in an argument that "was mostly [about] the liquor." Also, Officer White stated that he observed Defendant give his mother money, which he explained was "just folded up like a wad of money."

Additionally, the parties stipulated to the admission of all of the victim's medical records regarding his facial injuries. The State introduced these records prior to the

testimony of Dr. Jack E. Gotcher, who treated the victim's injuries and testified about the surgeries he performed on the victim.

Dr. Gotcher, an oral and maxillary facial surgeon at the University of Tennessee Medical Center, testified as an expert witness. Dr. Gotcher explained that the surgery he performed on the victim was a common one. Dr. Gotcher first encountered the victim on May 31, 2014, in the emergency room, and he stated that the victim had "suffered mid facial and lower facial injuries." Dr. Gotcher performed x-rays and determined that the victim "had multiple fractures in the middle portion of his face, and a mandible fracture of the lower portion of his face." Dr. Gotcher used a model of a skeleton to aid in his discussion of the victim's injuries. Using the model, he stood in front of the jury and showed them what portion of the victim's face needed to be repaired:

> In the lower jaw there was a fracture in the left body of the mandible. That's this portion right in the middle of -- the chin point and the angle of the jaw. So there was a fracture right here. And then there were multiple fractures in the middle part of the fac[e]. One fracture went through here, across and down deep in here. Another fracture pattern went up in here and into the nasal area. And another fracture went back in here and involved the cheek bone. And as part of the cheek bone fracture, there were a lot of different fractures that were in this area.

The State introduced photographs of the victim taken while Dr. Gotcher performed surgery, and while displaying these photographs, Dr. Gotcher discussed in detail the two surgeries he performed on the victim. Counsel for Defendant objected to the admission of the surgical photographs, but the trial court overruled the objection and allowed the photographs to be entered into evidence.

Dr. Gotcher testified that the "middle part of [the victim's] face was pretty significantly swollen. . . . So [Dr. Gotcher] waited a little while, let that swelling go down, and then operated on the middle portion of the face." It was done in two different sessions[,]" according to Dr. Gotcher. The first surgery lasted one to two hours while the second surgery lasted six to seven hours. One of the photos, Dr. Gotcher explained, was taken during the first surgery he performed on the victim's "left mandibular body." Dr. Gotcher said that this surgery was performed first because the fractures repaired in this surgery had "a high chance of becoming infected." He stated that this type of surgery "was approached through an incision in this portion of the neck." He continued,

> Everything is lifted up so we can avoid nerve problems. And then we manipulate the pieces back together, and there's a titanium bone plate that spans that. And if you look you can see there's a little line there, this was widely displaced before we lined everything up and plated that.

This surgery was completed approximately two days before the second surgery. He performed this second surgery "to fix the middle portion of his face[.]" Dr. Gotcher discussed the multiple fractures in the victim's face and stated "these are usually approached by making an incision inside the mouth, which we did in [the victim's] case, and it g[ave him] really good access to fixing fractures at this level." Dr. Gotcher agreed that by "looking at the bones that were injured, it's consistent with blows that came from different directions, more than one." He further stated that "a fair amount of force" would have been necessary to cause the victim's facial injuries. During the surgeries, the victim's face had to essentially be peeled down from the scalp in order to access the fractures. As part of the surgeries, the victim received several metal plates in his face. Staples were used to close the incision on the top of his head.

On behalf of Defendant, an audio recording of the preliminary hearing testimony of Marquita Cruze was played for the jury. Ms. Cruze was unavailable to testify because she died before the trial began. At the hearing, she testified that she knew both the victim and Defendant because they lived near her at Walter P. Ms. Cruze testified that she observed an altercation between the victim and Defendant while sitting on the back porch of her apartment at Walter P. She explained that "[t]here was a big crowd of people—a bunch of fellas"—and both the victim and Defendant were outside with the group of people. The victim "went home and got two knives." After retrieving the two knives, the victim "went back into the group of fellas[,]" and Defendant "hit [the victim] in his jaw and knocked him out[.]" She was not sure exactly what happened after the victim came back outside with the two knives, but she asserted that she saw Defendant hit the victim. She said that after being knocked out, the victim had to be carried back into his apartment. She did not call the police regarding the incident because she did not want to be involved and asserted that she was not a "snitch."

The victim testified as a rebuttal witness to Ms. Cruze's testimony. He viewed a photograph that he had previously identified as apartments at Walter P. In the photograph, the victim identified the back porch of his own apartment, and he had previously written "MC" on a porch that he believed to be the back porch of Ms. Cruze's apartment. When asked to confirm if that was Ms. Cruze's back porch, the victim responded, "–[I]t's one of those up in through there. I can't tell you exactly which one, but I'm thinking that's her apartment the one I circled." When asked about the distance between his porch and the porch he believed to be Ms. Cruze's, he said that he was able to see the people sitting on the porch, but he might not be able to see objects in people's hands. He then confirmed that, "[i]f [Ms. Cruze] was sitting on the back porch, [he] could see [her] sitting on the back porch from [his] back porch."

The jury convicted Defendant of reckless aggravated assault, a lesser-included offense of aggravated assault, and acquitted him of aggravated robbery and its

enumerated lesser-included offenses. Defendant was sentenced to twelve years imprisonment, as a career offender, which was to be served consecutively with a sentence from a conviction in Alabama. The trial court denied the Defendant's motion for a new trial, and he filed a timely appeal with this Court.

## ANALYSIS

### I. Comments by Prospective Juror During Voir Dire

On appeal, Defendant contends that his right to a fair and impartial jury was undermined during voir dire. Specifically, he argues that the trial court committed legal error when it failed to declare a mistrial after Mr. Miller's comments about a "notorious local murder that undermined the authority of the trial court proceedings and contaminated the rest of the venire." He claims that the statement linked Defendant with the killers in the Christian-Newsom murder case, and the trial court's curative instruction did not specifically address this taint "thereby leaving the remaining members of the venire with the idea that Defendant had similar legal and moral culpability to the convicted killers in the notorious Christian-Newsom case, with which all the local veniremen would reasonably be expected to be familiar." Further, Defendant argues that "the trial court also failed to address the comment of the venireman that the court system itself was 'flawed,' which also hearkened back to certain issues raised in the Christian-Newsom case regarding the lack of structural integrity in that trial." The State responded that the trial court properly exercised its discretion in denying Defendant's request for a mistrial regarding the potential juror's comments. We agree with the State.

The determination of whether to grant a mistrial rests within the sound discretion of the trial court. *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. *State v. Brown*, 53 S.W.3d 264, 284 (Tenn. Crim. App. 2000). A mistrial is an appropriate remedy when the trial cannot continue or a miscarriage of justice would result if it did. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The party seeking the mistrial has the burden of establishing the necessity for it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Unless there is evidence that the jury which heard the case was prejudiced or biased due to comments made by a prospective juror during voir dire, such comments are not grounds for a mistrial. *State v. Brown*, 795 S.W.2d 689, 696 (Tenn. Crim. App. 1990). In this case, Defendant speculates that the potential juror's statements prejudiced the jury against him but offered no proof supporting this argument. The prospective juror's opinion was based on an unrelated criminal case, and the trial court dismissed the potential juror. The trial court asked the remaining potential jurors if any of them had similar opinions, and none of them stated that they did. Additionally, the trial court

issued a curative instruction and reiterated that Defendant was presumed innocent at that point in time. The remaining jurors are presumed to follow the trial court's instructions. *State v. Banks*, 271 S.W.3d 90, 134 (Tenn. 2008). We conclude that the trial court did not abuse its discretion in denying Defendant's request for a mistrial.

## II. Admissibility of Photographs

Additionally, Defendant argues that the trial court abused its discretion and committed reversible error when it admitted numerous graphic photographs of the victim's face during surgery. The State responds that "the trial court properly exercised its discretion in admitting during-surgery photographs to aid the jury in understanding the extent of the victim's injuries." We agree that the trial court erred in admitting the photographs but find the error to be harmless.

To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g.*, *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Cmts).

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issue at trial and their probative value is not substantially outweighed by their prejudicial effect. *Banks*, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of an abuse of discretion. *Id.* at 949; *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993). In *Banks*, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider the following: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. 564 S.W.2d at 951. "Moreover, the admissibility of photographic evidence does not depend upon the

defendant's offer to stipulate to the facts depicted therein." *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000).

In order to determine if the admission of the photographs constitutes reversible error in this case, "we must determine if the photographs were relevant and whether their probative value was substantially outweighed by the danger of unfair prejudice." *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998). See Tenn. R. Evid. 402, 403. Second, "if the trial court abused its discretion and erred in admitting the photographs, we must determine whether such error was harmless." *State v. Curtis Scott Harper*, No. E2014-01077-CCA-R3-CD, 2015 WL 6736747, at *12 (Tenn. Crim. App. Nov. 3, 2015), *no perm. app. filed*.

The Defendant filed a motion in limine to exclude the surgical photographs of the victim, arguing that due to the "gruesome and horrifying nature" of the photographs, their probative value was substantially outweighed by the danger of unfair prejudice. The trial court reserved ruling on the motion. At trial, the Defendant objected to the surgical photographs' admission, and the trial court overruled the objection and allowed the photographs to be entered into evidence. The photographs were admitted as a collective exhibit during the testimony of Dr. Gotcher, who performed the surgery on the victim. The exhibit contained six oversized color photographs showing pictures of the victim's head and neck area draped in medical cloth with his skin cut and pulled back, bones, bone fragments, flesh, and blood beneath the skin, along with various surgical instruments.

Defendant challenged the admissibility of the photographs in a motion for a new trial. The trial court denied this request and reasoned:

> The issue on the pictures, one of the central issues here was not only how this fight occurred, but the State was required to prove that [the victim] suffered serious bodily injury. I think everyone and the jury understood that the nature of what they were looking at was surgically caused. In fact, the doctor testified . . . and showed the jury that the incision across the top of [the victim's] head was because his face had to be pulled back because of the damage that [Defendant] had caused. I think it's particularly relevant in this case because the allegation was that . . . [the victim] was acting in self-defense. And the question arose then did he go too far in defending himself if, in fact, it was believed that [Defendant] was the initial aggressor.

> So I think for all those reasons that those pictures were highly relevant and highly probative about the extent of the damage done to [the victim's] face.

Our supreme court has held that photographs "taken during or after an autopsy" are problematic "because lay jurors normally do not have the experience necessary to draw correct inferences from the appearance of internal organs." *Banks*, 564 S.W.2d at 951 (citing *State v. Morris*, 157 So. 2d 728 (La. 1963)). Similarly, jurors may have difficulty properly drawing inferences from graphic photographs taken during surgery which depict not only injuries sustained by the victim, but subcutaneous tissue and medical devices such as the ones shown in this case.

"As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." *Collins*, 986 S.W.2d at 21. In *Collins*, there were no issues in dispute regarding what was depicted in the photographs; thus, this Court found:

> In our view, the inherent prejudice of admitting color photographs of a bruised, bloodied, nude, infant victim is apparent. The size of the child was not in dispute. No issue was made about whether the baby was full-term. The medical testimony was undisputed as to that. That there had been a live birth was also uncontested. Dr. King presented unchallenged medical evidence that the air and water in the lungs established that the victim drew several breaths before drowning; there was hemorrhaging of the umbilical cord. Thus, the photographs were not probative at all. While the size of the victim may have been marginally relevant, that fact was not in dispute and had been established by the testimony. In our assessment, the prejudice substantially outweighed any probativeness.

*Id.*

Likewise, there were no issues in dispute in this case regarding the injuries that the victim suffered or what was depicted in the surgical photographs. The parties stipulated to the introduction of the medical records of the victim. The victim himself explained his injuries, the two facial surgeries, and the length of his hospital stay. Dr. Gotcher confirmed that he performed two such surgeries on the victim. In other words, the extent of the victim's injuries was clearly stated and not contested.

"In many cases, the facts concerning the injuries and the cause of death may be adequately established and better explained by a pathologist." *Banks*, 564 S.W.2d at 952. In *Banks*, our supreme court acknowledged that

> [a] case can be imagined in which a photograph could supplement the medical testimony to give a better understanding of the number of wounds inflicted and the manner in which the killing was carried out, but this was not one. The pathologist catalogued the injuries and described them in

detail. He gave more information about them than the photographs do. His explanation is readily understandable without a pictorial portrayal.

*Id.* (holding that the prejudicial effect of photographs depicting the murder victim's battered head and body outweighed their probative value). Similarly, Dr. Gotcher discussed the extent of the victim's injuries and even used a skeletal model to more effectively convey the exact location and severity of the victim's injuries. He also indicated that a large amount of force would have been necessary to inflict these injuries on the victim. Though he used the surgical photographs during his discussion of the surgeries he performed on the victim, Dr. Gotcher offered sufficient testimony beyond the discussion of the surgeries to establish the fact that the victim suffered serious bodily injury.

In addition to Dr. Gotcher's testimony, several other witnesses testified about the victim's injures. The victim himself testified that Defendant had repeatedly hit him in the face causing injury. He discussed his time in the hospital and the hours of surgery he was required to endure. He explained that he still had pain from the injuries and resulting vision complications. The victim also identified a collective exhibit of enlarged photographs depicting his injuries. The victim was able to show the jury the surgical scars under his chin. Additionally, Officer Turner testified about the victim's injuries. Officer Turner found the victim in his apartment and described how the victim had a cut near his hairline and appeared to have a broken nose. Referring to the victim's apartment, he stated that "[b]lood was everywhere."

While the photographs are gruesome, we must determine if their probative value was substantially outweighed by the danger of unfair prejudice. Defendant was charged with aggravated assault, which is intentionally or knowingly committing an assault resulting "in serious bodily injury to another[,]" and aggravated robbery, which is a robbery in which "the victim suffers serious bodily injury." T.C.A. §§ 39-13-102, -402. The photographs were relevant to establish whether the victim suffered serious bodily injury and whether Defendant used excessive force if acting in self-defense. As discussed previously, the injuries were without question caused by multiple blunt force traumas. The exact method used to cause the injuries was not at issue. Therefore, photographs of the surgery were unnecessary to prove attack angles, position of the victim's body, etc. In short, it was the damage done, not what was done to repair it, that was relevant. We concluded that the danger of unfair prejudice by admitting the somewhat relevant surgical photographs substantially outweighed their probative value. Thus, we conclude that the trial court erred in admitting the surgical photographs of the victim. Now, we must determine whether this error was harmless.

Improperly admitted evidence is reviewed under a non-constitutional harmless error analysis. *State v. Jeff Carter*, No. M2009-02399-CCA-R3-CD, 2010 WL 5343212,

at *13 (Tenn. Crim. App. Dec. 16, 2010) (citing *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003)), *no perm. app. filed*. In determining whether a non-constitutional error is harmless, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Id.* at 372 (quoting Tenn. R. App. P. 36(b)). While substantial evidence of the defendant's guilt makes it difficult for "the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial," the harmless error inquiry "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict [wa]s correct." *Id.* Rather, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision making." *Id.*

As previously noted, the surgical photographs of the victim in this case had minimal probative value. As stated above, it was undisputed that Defendant caused the victim's injuries, but there was conflicting testimony regarding the circumstances of the incident between the victim and Defendant. The victim admitted to being intoxicated at the time of the incident and testified that Defendant entered his apartment and attacked him. However, Defendant told Officer Turner that he hit the victim in self-defense after the victim attempted to stab him. Furthermore, Ms. Cruze testified that the incident between the victim and Defendant occurred outside the victim's apartment in the presence of a group of people. She observed the victim approach Defendant with two knives and then Defendant punched the victim. Ms. Cruze's testimony partially contradicted the victim's version of the events. The jury heard all of this testimony, including Defendant's claim of self-defense, and the trial court's instruction regarding the degree of force Defendant reasonably believed was immediately necessary to protect himself. The jury was tasked with weighing the evidence. *See State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

From their verdict, it is evident that the jury discounted portions of the victim's testimony because Defendant was acquitted of aggravated robbery and convicted of reckless aggravated assault, a lesser-included offense of the indicted offense of aggravated assault. *See State v. Adams*, 45 S.W.3d 46, 56 (Tenn. Crim. App. 2000) (holding that the jury is entitled to accept portions of witness's testimony and reject other portions). Given the conflicts in the testimony, and the fact that the jury found Defendant guilty of a lesser-included offense on one charge and acquitted Defendant of the other, we cannot say it is more probable than not that the inflammatory surgical photos affected the jury's decision as to what occurred at Walter P. on the day in question and resulted in prejudice to the judicial process. Based on the entire record, we conclude the impact of the error cannot reasonably be taken to have negatively impacted the jury's verdict against Defendant. Thus, the error in admitting the photographs was harmless.

*Conclusion*

Based upon consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE