IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 31, 2021 Session

**STATE OF TENNESSEE v. TYRONE E. MURPHY**

**Appeal from the Criminal Court for Hamilton County**
**No. 302991   Barry A. Steelman, Judge**

_____

**No. E2020-00658-CCA-R3-CD**
_____

The Hamilton County Grand Jury indicted Defendant, Tyrone E. Murphy, with one count of first degree premeditated murder and one count of tampering with evidence in the death of Ashley Cates, the victim. The State proceeded solely on the count of first degree premeditated murder. The jury convicted Defendant as charged, and the trial court sentenced Defendant to life imprisonment. On appeal, Defendant argues that the trial court erred by denying his motion in limine to exclude post-mortem photographs of the victim and that the evidence was insufficient to support the verdict. After a thorough review of the record and applicable law, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Kendall F. Stivers, Assistant Public Defender, Tennessee District Public Defenders Conference, Franklin, Tennessee, (on appeal), and Steve Smith, District Public Defender, and Andrew Childress, Assistant Public Defender, Chattanooga, Tennessee, (at trial), for the appellant, Tyrone E. Murphy.

Herbert H. Slatery III, Attorney General and Reporter; Mark Alexander Carver, Honors Fellow, Office of the Solicitor General; Neal Pinkston, District Attorney General; and Cameron Williams and Andrew Coyle, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

*Motion in Limine*

Defendant filed a pretrial motion in limine to exclude post-mortem photographs of the victim, arguing that the photographs created unfair prejudice which substantially outweighed any probative value. Alternatively, Defendant moved that the photographs be admitted only in monochrome. At a hearing on the motion, Defendant admitted as exhibits the fifty-six photographs which the State sought to introduce at trial, and the trial court reviewed them individually. Defense counsel also argued that some of the photographs were cumulative.

The trial court stated that, due to the nature of modern media, it did not "think that people were as shocked by the presence of blood as they were at one time." It determined that the probative value of seven of the photographs was to show bruising on the victim, so it denied Defendant's request that they be admitted in monochrome.[1] The State agreed to admit most of the autopsy photographs in monochrome, and defense counsel stated that the monochrome photographs would resolve "the majority" of Defendant's objections "as to unfair prejudice."[2] The trial court removed one photograph that was a "zoomed in" copy of another photograph and permitted all other photographs to be admitted at trial as proof arose that made them relevant, finding that the prejudice from the photographs did not outweigh their probative value. The trial court noted that, as issues came up at trial, it would entertain further arguments regarding the admission of the photographs.

*Trial*

Frank Timothy Mosteller testified that he was the victim's stepfather and that the victim lived with him periodically from 2011 to 2016. Then, the victim moved in with her brother and later moved into her own apartment on Bailey Avenue in Chattanooga. Mr. Mosteller said that the victim could be "cantankerous" sometimes. He said that, when the victim was killed, she was thirty years old and five feet, five inches tall.

Mr. Mosteller recalled that, on June 4, 2017, at about 5:30 p.m., his wife told him that she could not reach the victim, despite trying to contact the victim all day. Approximately two hours later, Mr. Mosteller and his wife drove to a friend's house to try

---

[1] Exhibits 1-12, 14-17, and 19-22 to the motion in limine hearing were admitted at trial in color.

[2] Exhibits 23-31, 33-49, and 51-56 to the motion in limine hearing were admitted at trial in monochrome.

to find the victim. When they saw that the victim was not there, they drove to the victim's residence on Bailey Avenue. Mr. Mosteller described the residence as a home that had been converted into apartments, and he said that the victim lived in an apartment at the top of the stairs. Mr. Mosteller explained that the front main door was locked, so he walked to the back of the apartments and saw that the victim's window was intact. After Mr. Mosteller contacted the landlord, another resident, Donna Weaver, let Mr. Mosteller and his wife into the main door of the house. Mr. Mosteller said that he and his wife walked up to the victim's apartment, which was near Defendant's apartment, and saw that the victim's door was shut and locked. He recalled that he started "banging on the door . . . and yelling" because he saw that the victim's car parked out front and knew that she must be there. Mr. Mosteller said that another neighbor, David King, came out of his apartment and asked what was wrong. When Mr. Mosteller explained why he and his wife were there, Mr. King found some tools in his apartment to pry the victim's door open.

Mr. Mosteller recalled that he eventually "popped" the door open, and he saw the victim lying on the floor with her legs up on the couch. He saw that the victim had several wounds and dried blood and that her eyes were open. Mr. Mosteller said that he touched the victim and that she was cold and "stiff," so he knew that she was dead. He recalled that the victim's mother, Janice Mosteller, "let out a very loud shrill" and started "screaming very loudly[.]"[3] He said that someone called 911 and that he and Mrs. Mosteller remained downstairs until police arrived.

On cross-examination, Mr. Mosteller agreed that, for a time, the victim was "couch-surfing" and that he tried to get the victim "to grow up and take responsibility." Mr. Mosteller recalled that the victim was a "homebody" and was content to remain at home most evenings. He said that the victim "liked to sleep" and that sometimes it was hard to wake her up for work.

David King testified that he lived in the apartments on Bailey Avenue at the time of the offense. He stated that Defendant, the victim, and Ms. Weaver were also residents of the Bailey Avenue apartments. Mr. King recalled that the victim lived at the Bailey Avenue apartments for "two or three weeks" before she was killed. He said that the only entrance to access the apartments was the front entrance and that the front door remained locked. Mr. King said that every resident had a key to the front entrance. He explained that residents could only reach the laundry room by walking outside to the rear of the apartments.

---

[3] Mrs. Mosteller also testified at trial. She testified to substantially the same events as Mr. Mosteller; therefore, we have redacted her testimony for the sake of economy.

Mr. King recalled that, on June 4, 2017, he woke up about 3:00 or 4:00 a.m. to what he thought was a woman screaming. He said that he got out of bed and continued to listen but that he did not hear anything else, so he "just assumed it was nothing." Mr. King explained that, about 8:00 p.m. that night, he heard a woman knocking on the victim's door and yelling for the victim to "open up." Mr. King said that, after about twenty minutes of the woman yelling at the victim's door, he went out into the hall to see what was happening. The woman told Mr. King that she was the victim's mother and had been trying to reach the victim all day. Mr. King recalled that he tried to help Mr. and Mrs. Mosteller enter the victim's apartment using items to "jimmy" the lock. He said that one of the items he used to attempt to pry the door open was a dagger that he had in his car. Mr. King stated that, when they opened the door, Mr. and Mrs. Mosteller went inside and started screaming. Mr. King walked in behind them and saw the victim lying on the floor with her leg on the couch. He recalled that the victim was "completely white" and was "clearly deceased." Mr. King said that he immediately called 911. He stated that he went downstairs to wait for emergency personnel so that he could direct them to the victim's apartment.

On cross-examination, Mr. King testified that, when he went to bed on the night of June 3, 2017, he left the music on in his apartment. He said that, when he woke in the middle of the night, he "didn't definitively know" that he had heard a woman screaming but that he thought that the screaming "went on for a minute or two." Mr. King explained that, when he viewed the apartment after they pried the door open, he could not tell if anything had been disturbed in the apartment. He did not recall anything in the victim's hands.

Donna "D.J." Weaver testified that she lived at the Bailey Avenue apartments at the time of the offense. She said that the victim was her neighbor and that she would see her on the front porch at times because they both smoked cigarettes. Ms. Weaver stated that, during the time the victim lived at the Bailey Avenue apartments, Ms. Weaver saw and spoke to Mrs. Mosteller several times when she came to visit the victim. Ms. Weaver recalled seeing the victim and Mrs. Mosteller on June 3, 2017, and said that they invited her to join them for pizza, but Ms. Weaver declined. Ms. Weaver stated that she did not wake up to any strange noises on the night of June 3 or early morning of June 4, 2017. She said that the walls were "thick" and that she could not hear what was going on in other apartments unless she was in the hallway.

Ms. Weaver recalled that, on the evening of June 4, 2017, she saw Mr. and Mrs. Mosteller outside the victim's door. She said that she heard them yelling in the hallway, so she came out to investigate. Ms. Weaver saw Mr. and Mrs. Mosteller and Mr. King trying to open the victim's door. She recalled that, when they got the door open, she saw the victim lying in a pool of blood. Ms. Weaver said that Mrs. Mosteller was hysterical and ran downstairs and that Ms. Weaver followed her to try to console her.

- 4 -

Ms. Weaver testified that Defendant was also a resident at the Bailey Avenue apartments and that she saw him on the morning of June 4, 2017, at approximately 8:00 a.m. when she took her dog out for a walk. Ms. Weaver said that Defendant came from the side of the building, so she assumed that he was in the back doing laundry. She recalled that Defendant had wrapped his left hand with a blue towel and that she asked him about it. Defendant told her that he hurt his hand at work. Ms. Weaver said that Defendant's demeanor was normal. Approximately thirty to forty minutes later, Defendant knocked on Ms. Weaver's apartment door and offered her some cigarettes, but Ms. Weaver declined. Again, she said that Defendant's demeanor was normal. Ms. Weaver said that Defendant was not present in the apartments when they discovered the victim's body and that she assumed he had gone to work.

On cross-examination, Ms. Weaver said that Defendant was normally friendly and "happy-go-lucky." She said that, when she left her apartment early on June 4, 2017, she did not notice anything out of place or unusual in the hallway.

Chattanooga Police Department ("CPD") Officer George Romero testified that he was involved in the investigation of the homicide at the Bailey Avenue apartments. He said that he was one of the first officers on the scene. Officer Romero recalled that, when he and another officer went upstairs to the victim's apartment, no one else was upstairs at the time. Officer Romero and the other officer "cleared" the victim's apartment to ensure that no one else was dead or injured, but no one else was present. Officer Romero recalled observing the victim:

> You could clearly tell that she had been killed. She had a huge laceration to her neck. . . . You could see all the way down her throat. She had a bunch of different cuts all along her arms. And then on the side of her face you could see that there were really deep lacerations on her face as well.

Officer Romero said that, when he exited the victim's apartment, there was a stairwell immediately to the left and that the door to the stairwell was open. He saw dried blood on the ground and on the doorknob by apartment 2B, which was near the victim's apartment on the same floor. Because of the blood by apartment 2B, Officer Romero and other officers breached the door. The officers found Defendant inside apartment 2B "acting like he was asleep." They put Defendant in handcuffs and noticed a huge, freshly-stitched laceration on his hand. Officer Romero stated that he and the other officers removed Defendant from his apartment, closed the door, and waited for homicide detectives to arrive.

On cross-examination, Officer Romero said that the dried blood on the floor in front of Defendant's apartment was "a couple of drops."

CPD Officer Dennis Nelson testified that he worked with the crime scene unit and that he arrived at the scene of the homicide on Bailey Avenue at 10:31 p.m. on June 4, 2017. He said that he took photographs and gathered evidence at the crime scene.[4] Officer Nelson noted that, in some of the photographs, the victim's bra strap had been severed. He took several swabs around both the victim's and Defendant's apartments to test for DNA. Officer Nelson said that he also used a chemical reagent in the hallway and on doorframes to find if anyone had attempted to clean up blood that was no longer visible to the naked eye. He testified that the chemical reagent showed areas where trace amounts of blood remained inside the victim's apartment, on the hallway floor in front of Defendant's door and the victim's door, and on the floor just inside of Defendant's door.

Officer Nelson stated that he found hospital discharge papers inside Defendant's apartment indicating Defendant's release from the hospital at 2:47 p.m. on June 4, 2017. Officer Nelson said that he investigated the laundry room and confiscated a hamper with clothes. He recalled that Investigator Kenny Burnette drew his attention to a black plastic bag in the laundry room. Later, when Officer Nelson opened the plastic bag in his crime scene unit, he found "bloody miscellaneous items and towels," including a purse containing the victim's driver's license.

Officer Nelson said that he conducted a follow-up search of the premises five days later and found the victim's car keys in an alleyway behind the Bailey Avenue apartments.

On cross-examination, Officer Nelson testified that using the chemical reagent on the trace blood evidence did not affect the DNA and that he swabbed two places in the hallway with the trace blood evidence. Officer Nelson said that the chemical reagent could pick up trace blood that was years old and that the chemical reagent could also react with some cleaning agents in the event some were used to try to clean the blood, but he said that a reaction with cleaning agents would be "less intense."

Taylor Cates testified that she was married to the victim's brother, Matthew Cates. She said that the victim lived with her and Mr. Cates in May 2017 for about a month. Mrs. Cates said that she knew of the Bailey Avenue apartments and helped the victim to secure one in which to live. She recalled that she and Mr. Cates gave the victim some household items when she moved into her Bailey Avenue apartment. Mrs. Cates identified a rug that

---

[4] During a bench conference, defense counsel renewed his objection to the photographs which were labeled exhibits 89 and 102-110. Defense counsel said that the State redacted to the satisfaction of the defense the photographs labeled exhibits 98 and 100. The trial court overruled the objection.

was in the black plastic bag of bloody miscellaneous items as a rug that she gave to the victim. Mrs. Cates said that the victim kept the rug in the bathroom.

CPD Investigator Daryl Slaughter testified that he worked with the major crimes unit and that he investigated the homicide on Bailey Avenue with three other investigators. After viewing the crime scene and interviewing Mr. and Mrs. Mosteller, Investigator Slaughter questioned Defendant. Investigator Slaughter said that Defendant waived his *Miranda* rights in writing and agreed to answer questions. He recalled that Defendant freely offered information and said that he asked Defendant many times if Defendant needed anything or wanted coffee.

Special Agent Mark Dunlap testified that he worked as a forensic scientist for the Tennessee Bureau of Investigation ("TBI"). He said that the TBI received items from all over the state for DNA testing, so his lab was not able to test every single item they received. Agent Dunlap explained that the TBI lab typically tests ten items from a homicide case to see if those ten items "answer[] the questions for resolving of the case." He said that further items are tested as needed to help resolve the case. Agent Dunlap testified that he obtained DNA profiles from swabs of ten items from the crime scene in the present case and then compared them to DNA samples from the victim, Defendant, and Ervin Tanner.

Agent Dunlap explained the DNA test results as follows:

| Location swabbed | DNA match(es) |
|---|---|
| Victim's driver license, from plastic bag | Defendant |
| Edge of victim's door, below lock | Victim |
| Victim's interior door knob | (1) Defendant; and (2) inconclusive |
| Victim's body--right inner calf/ankle area | Victim |
| Floor, east of victim's desk | (1) Defendant; and (2) unknown contributor |
| East of victim's desk chair | Defendant |
| Floor, inside victim's bathroom doorway | Defendant |
| Victim's body--thigh area (left and right) | (1) Victim; and (2) inconclusive |
| Victim's body--right side, above waistline | (1) Defendant; and (2) Victim |
| Victim's closet door frame, near entrance | Defendant |

On cross-examination, Agent Dunlap explained that "touch" DNA, which comes from skin cells, and DNA from a bloodstain are the same type of DNA. He said that, if both touch DNA and bloodstain DNA were present at the same place, a test could not separate which DNA came from which type of cell. Agent Dunlap stated that all the swabs he tested were positive for human hemoglobin, which is a component of blood. He said that his tests could not determine how the DNA got to where it was found.

Ervin Tanner, Jr., testified that he worked at a restaurant named Sticky Fingers as a cook and that Defendant was his co-worker as a dishwasher. He said that, prior to June 4, 2017, he had known Defendant about three months. Mr. Tanner said that, on the night of June 3, 2017, Sticky Fingers closed "around 11[:00 p.m.]" and that Defendant asked for a ride home. He recalled that, when they pulled up to Defendant's residence, a young, white woman was sitting on the porch, smoking a cigarette. Mr. Tanner recalled speaking to the young woman for about ten minutes while Defendant was in his apartment. Defendant returned and told Mr. Tanner to come upstairs with him to view some items he wished to sell, and Mr. Tanner followed him.

After a few minutes, the woman also came upstairs and asked Mr. Tanner and Defendant if they knew anyone who worked on refrigerators. Mr. Tanner said that Defendant offered to look at her refrigerator for her and then followed the woman into her apartment for two or three minutes. Mr. Tanner, Defendant, and the woman returned downstairs and then ran some errands in Mr. Tanner's car, first to meet a friend of Defendant and then to a gas station for beer and cigarettes. The three then returned to the Bailey Avenue apartments and shared the beer and cigarettes while on the porch. Mr. Tanner left at "one-something" or "two" in the morning while Defendant and the woman were still on the porch, "laughing and talking." Mr. Tanner testified that he did not see any injuries on Defendant that night and that Defendant did not mention being injured at work.

On cross-examination, Mr. Tanner said that he did not remember the exact day that he gave Defendant a ride home but that he knew it was a Saturday night in June 2017.

Dr. James Metcalfe testified that he was a forensic pathologist at the Hamilton County Medical Examiner's Office. Dr. Metcalfe said that he performed the autopsy of the victim and determined her manner of death to be homicide and her cause of death to be multiple stab wounds to the neck and chest.[5] Dr. Metcalfe said that he found both stab wounds and "incised" wounds and explained that "a stab wound would be where the blade goes in" and an "incision would be like a cut where it goes across the skin or underneath tissue" and was "longer than it was deep." Dr. Metcalfe's report showed fifteen stab wounds and seven incised wounds to the victim's face, head, neck, and chest. Dr. Metcalfe explained in detail the internal damage to the victim from each wound, including whether each would be fatal in itself, using the autopsy photographs and drawn body diagrams attached to the autopsy report:

---

[5] In a sidebar, defense counsel agreed that any objection he had to the autopsy photos, labeled trial exhibits 221-259, he raised in his motion in limine. The trial court noted defense counsel's objection but stated that it "persisted" in its ruling that the photographs were admissible. The autopsy photographs labeled exhibits 222-249 were admitted in monochrome; the autopsy photographs labeled exhibits 221 and 250-255 were admitted in color.

| No. | Wound | Internal injury |
|---|---|---|
| 1 | Stab wound, right jaw | Parotid salivary gland |
| 2 | Stab wound, right of mid neck (fatal wound) | Right internal jugular vein; mid-cervical vertebral column |
| 3 | Stab wound, right of lower neck, exiting back of neck | Mid-cervical vertebral column |
| 4 | Stab wound, right clavicle area (fatal wound) | Right subclavian artery |
| 5 | Stab wound, medial right lower neck (fatal wound) | Superior vena cava |
| 6 | Stab wound, mid lower neck (fatal wound) | Trachea, carotid artery, left subclavian artery, upper lobe of left lung, posterior left third rib |
| 7 | Stab wound, left clavicle area | Muscle |
| 8 | Incised wound, left mid neck | Subcutaneous tissue |
| 9 | Stab wound, upper mid left neck | Hyoid bone at top of larynx; right vallecula; tip of epiglottis at back of throat; muscle |
| 10 | Stab wound, left side of chin | Submandibular salivary gland, vertebral column |
| 11 | Stab wound, front of left ear | Masseter muscle |
| 12 | Stab wound, front of left ear, upper | Left external ear canal; knife broke off and remained in temporal bone |
| 13 | Stab wound, front of right ear | Muscle; right mandible |
| 14 | Stab wound, left upper chest | Muscle; breast tissue |
| 15 | Stab wound, right upper chest | Muscle; armpit tissue |
| 16 | Incised wound, left forearm | Muscle; subcutaneous tissue |
| 17 | Stab wound, left wrist - through and through | Subcutaneous tissue |
| 18 | Incised wound, left hand | Muscle; subcutaneous tissue |
| 19 | Incised wound, right forearm | Subcutaneous tissue |
| 20 | Incised wound, lateral right wrist | Subcutaneous tissue |
| 21 | Incised wound, right upper arm | Subcutaneous tissue |
| 22 | Incised wound, right tip of thumb | Subcutaneous tissue |

Dr. Metcalfe said that the victim's trachea was almost completely severed, which would have affected her ability to scream for help. He estimated that she died from her wounds in a "small number of minutes." He explained that the stab wound to the victim's left clavicle was at a more upwards angle than the other wounds, which suggested to him that its purpose was to "inflict pain rather than to cause damage."

In addition to the wounds detailed individually in his report, Dr. Metcalfe's report also indicated smaller incised wounds of the victim's "hands, face, neck, left shoulder, and thighs" and small contusions of "left neck, arms, knees, shins, and ankles." Dr. Metcalfe explained that several of the victim's wounds on her arms and hands were "defensive wounds" where she was "trying to stop the [perpetrator] from doing whatever [he was] doing." Dr. Metcalfe said that there was no sign of sexual assault but that it appeared, based on the way blood was smeared on the victim's legs, that "a person was trying to pull her legs apart[.]"

In a sidebar, the trial court further explained its reasoning on admitting the photographs:

> [Dr. Metcalfe] has obviously used the photographs to explain, and the [c]ourt finds that those photographs were more illustrative than the plain diagram and so for those reasons I am not only -- if there was any question with regard to my ruling earlier as to whether 2[2]1 through 259 were actually admitted -- well, they are admitted now.

On cross-examination, Dr. Metcalfe testified that a six-and-one-half inch sharp-edged instrument like a knife inflicted the injuries on the victim and that there was no way to know if it was one or multiple instruments that caused the wounds. He agreed that alcohol and Xanax found in the victim's system, taken together, might have affected her judgment. Dr. Metcalfe said that the wounds present in exhibits 246, 250, and 251 appeared to be defensive wounds.

Following a *Momon* colloquy, Defendant testified that, in June 2017, he lived at the Bailey Avenue apartments and worked "a lot of hours" at two different jobs. He said that he worked at Sticky Fingers the first Saturday night in June 2017 and that he left work "around midnight." Defendant recalled that Mr. Tanner offered Defendant a ride home that evening. Defendant said that Mr. Tanner often drank when he was on shift at Sticky Fingers and that the managers had to "watch him." Defendant stated that Mr. Tanner was "slurring" as he was driving Defendant home but that Mr. Tanner seemed to know exactly where Defendant lived. Defendant said that Mr. Tanner told him, "I know exactly where you stay. . . . The other night I was out there[,] and there was a white girl out on the porch."

Defendant said that, when Mr. Tanner testified, Mr. Tanner was talking about dropping Defendant off on a different night when he saw "a white girl . . . on the porch" rather than the first Saturday night in June. Defendant said that Mr. Tanner's testimony was false and that Mr. Tanner never spent time with Defendant and the victim but only dropped Defendant at home.

Defendant said that, at midnight between June 3-4, 2017, Mr. Tanner dropped Defendant at home, and Defendant went inside. Defendant recalled that he went up to his second floor apartment with his keys in his hand. He said,

A door come flying open and the lady came running out, hair was like bushy, eyes big, and came right at me, but I didn't see nothing . . . in her hand or nothing like that. The only thing that I caught was the back arm and, you know, like a swing and . . . dropped everything like that. She said something about making noise or something. . . . And when I did like that, she back-armed me, and I see two blades. My hand look like it was hanging off. Blood. And it was so quick, I grabbed the arms. I grabbed the wrists, grabbed -- we right there at [Mr.] King's door now and that's when the struggle started right there, all across the hallway. . . . And she tightening up, everything, she just strong. . . . I'm tired, I ain't expecting nothing. She really handled me as far as I can't get the knife. I can't get them from her. She got to drop them, that's the only way I'm going to get it from her. She got to drop them.

Now, at this time it ain't nobody's blood out there but mine.

Defendant explained that the victim was holding two blades in one hand, but he did not remember which hand. Defendant said that he struggled with the victim and that she was not "stuck until [they] got over [] to her door." He explained that the victim was holding the knives and that he was holding her wrists and "controlling" them. He said that "the craziest thing about it[,] it's like you would think [the victim] would drop them." Defendant said that the victim "was getting stronger and forceful. . . . The sticking, sticking, sticking, and it was getting -- man, it was like the crazier it was getting it was like she was getting stronger with it or just wasn't giving up." Defendant said that "[a] lot of sticking going on because she wasn't bringing her arms down."

Defendant stated that he and the victim struggled into the victim's room and that "all that sticking that was going on up here" was because he was "trying to shake [the knives] off of her[.]" He said,

I'm on her; I'm trying to keep the knife in like that, she's pulling out, and she was getting kicked everywhere. And . . . that went on for a good minute. A lot of sticking. . . . And when she screamed she didn't -- the doctor was right. The doctor was right in the sense because there wasn't no really no scream.

Defendant recalled that he "threw her in" her apartment and that he "pushed her down and . . . she flopped down like that." Defendant stated that, when the victim fell, the

- 11 -

knives were "with her right there." Defendant said that he was "bleeding bad" but that the victim "was bleeding badder." He recalled that "blood went all down [his] shirt on the inside. This hand was red with her blood."

Defendant said that, after the struggle, blood was everywhere and that the floor was "unpassable." He said that was why he "tried to clean" the hallway with rags he had in his backpack from the restaurant. He recalled that his hands were shaking and said, "I'm nervous. I'm scared as hell. I look out in that hallway, that white woman over here slaughtered." He stated that he wrapped his hand well enough to start cleaning but that he only cleaned the hallway and not his or the victim's apartments.

Defendant said that he did not know what to do. He said that he did not call the police because he was afraid that the police would "hog-tie" and beat him with flashlights for killing a white woman. Defendant stated that he did not think the police would believe that he was attacked because they would "come up there and [Defendant] looking like that [with] blood everywhere." Defendant said that he "ruined everything he touched" because his hands were covered in blood and that he bagged up several items and took them to the laundry room. Defendant said that he washed his bloodied restaurant uniform.

When Defendant went to the hospital, he told the doctor that he was injured at the restaurant because he "didn't want to do nothing that was going to bog up no police officers." Defendant recalled that he went home from the hospital and fell asleep. He said that "reality hit" when he woke up and realized that the victim "was somebody's child." Defendant said that police officers came into his apartment and placed him under arrest. He said, "The ambulance man had to get the police officer to loosen [the handcuffs] up on me, like I was a slave tied down in a ship." Defendant said that he lied to police in his statement because he was scared but that he was not lying at trial.

On cross-examination, Defendant said that he was close to the same size as the victim. Upon examining the post-mortem photograph of the victim in her apartment, Defendant said, "[That's] [w]hat we did together. She wouldn't let go; I wouldn't let go." He said that the victim caused her own injuries "with [Defendant's] help." Defendant said, "[If] [t]hat woman would let them knives go that would have been over with. Do you know what's killing me, sir[?] Had her momma stay over that night, wouldn't none of us be here, wouldn't none of us be here." Defendant stated that he did not kill the victim "in cold blood" but "in self-defense" and that, "by law," he did not have to retreat.

Defendant denied that he heard the Mostellers' yelling for the victim in the hallway or beating on her door. He denied hearing the CPD officers beating on his door and yelling for him. Defendant said that he did not know if the victim was dead but that he knew she was in her apartment. Defendant agreed that he made no attempt to get help for the victim

- 12 -

but said that he "wasn't [him]self at all" and that he was "a straight nut case." Defendant agreed that he told the police that he had no involvement in the victim's death and that he said to police, "[W]hat I say today, I can say tomorrow." Defendant agreed that he lied to the doctor at the hospital, to his neighbor Ms. Weaver, and to police.

Defendant denied that he placed the black plastic bag full of bloodied items in the dark basement for the purpose of hiding evidence. Defendant denied trying to make the scene look like a robbery. Defendant denied that he cut himself; he said that the victim cut him. Defendant said that he did not know what happened to the two knives the victim allegedly cut him with. Defendant denied putting the victim's keys in the alley behind the property.

The prosecutor showed Defendant several exhibits[6] individually and asked Defendant if he remembered the stab wound in each photograph. Defendant replied to each photograph that he remembered "the struggle" but not each stab wound individually. Defendant did not remember the victim's raising her hands and arms in defense. Defendant denied trying to "rip" the victim's shirt off or take off her clothes. He denied trying to pry the victim's legs open.

The trial court instructed the jury on self-defense, and the jury convicted Defendant of first degree premeditated murder. The trial court sentenced Defendant to life in prison. Defendant filed a timely motion for new trial, which the trial court denied. Defendant now appeals.

## Analysis

Defendant argues that the trial court erred in denying his motion in limine to exclude "gruesome, full-color photographs" of the victim's body because the photographs were "unfairly prejudicial or needlessly cumulative." He also asserts that there was insufficient evidence to support the elements of intent and premeditation because the "testimony and evidence suggested that [Defendant's] mental state was not sufficiently free from passion when he killed [the victim]."

### I. Crime Scene and Autopsy Photos

Defendant argues that the trial court abused its discretion when it admitted numerous graphic and gruesome crime scene and autopsy photographs into evidence. Specifically, Defendant argues that the admission of trial exhibits 103 and 105 was error because they were duplicative of exhibits 256 and 257. Moreover, he asserts that exhibits

---

[6] The prosecutor showed Defendant exhibits 104, 105, 222-224, 226-232, and 238.

106-109 were "needlessly cumulative" due to exhibits 71, 89, and 104. Finally, Defendant contends that the admission of exhibits 98, 100, 102, 103, and 105-110[7] was error because the photographs were not probative, did not aid in testimonies from State witnesses, did not rebut Defendant's testimony, were highly and unfairly prejudicial, and "served only to elicit emotions of sympathy and horror within the jurors."

The State responds that the trial court did not abuse its discretion in admitting the photographs of the victim's body.

Whether the admission of the photographs constitutes reversible error requires a two-step analysis. First, we must determine whether the photographs were relevant to an issue the jury would be required to determine and whether their probative value was substantially outweighed by the danger of unfair prejudice. *See State v. Banks,* 564 S.W.2d 947, 951 (Tenn. 1978); *State v. Collins,* 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998). Second, if the trial court abused its discretion and erred in admitting the photographs, we must determine whether such error was harmless. *See Banks,* 564 S.W.2d at 952-53; *Collins,* 986 S.W.2d at 21-22.

In order to be admitted into evidence, a photograph must be relevant to an issue that the jury must decide. *State v. Thomas,* 158 S.W.3d 361, 394 (Tenn. 2005). "[E]vidence is relevant if it helps the trier of fact resolve an issue of fact." *State v. James,* 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et al., *Tennessee Law of Evidence* § 4.01[4], at 4-8 (4th ed. 2000)). However, relevant evidence should be excluded if its prejudicial effect substantially outweighs its probative value. *Banks,* 564 S.W.2d at 951. "[T]he admissibility of photographs lies within the discretion of the trial court," whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.* at 949.

Rule 403 of the Tennessee Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks,* 564 S.W.2d at 951 (quoting Advisory Committee Note to Federal Rule of Evidence 403). This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *Collins,* 986

---

[7] Defendant argues that "trial exhibits" 4-12 and 14 should have been excluded. There are no trial exhibits 4-12 or 14 in the record. It appears Defendant is referring to the photographs' motion in limine exhibit numbers. The corresponding trial exhibit numbers are 98, 100, 102, 103, and 105-110.

S.W.2d at 20 (quoting M. Graham, *Handbook of Federal Evidence,* 182-83 (2d ed. 1986)). Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." *Banks,* 564 SW.2d at 951. Evidence which only appeals to the sympathies of the jury, conveys a sense of horror, or "engenders an instinct to punish" should be excluded. *Collins,* 986 S.W.2d at 20. Factors to be considered when determining whether the probative value of photographs of homicide victims outweighs their prejudicial effect include:

> [T]he value of the photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Banks*, 564 S.W.2d at 951. "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." *Id.* "As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." *Collins,* 986 S.W.2d at 21 (citing *State v. Duncan,* 698 S.W.2d 63, 69 (Tenn. 1985)). Photographic evidence may be excluded when it does not add anything to the testimonial description of the injuries. *Banks,* 564 S.W.2d at 951. Autopsy photographs often fall into this category. *Id.* This is especially true when the defendant does not dispute the injuries to the victim or cause of death. *See Banks,* 564 S.W.2d at 952 (autopsy photographs not probative when the defendant did not dispute that the victim's death was caused by multiple wounds to the face and head); *Collins,* 986 S.W.2d at 21 (autopsy photographs of a newborn not probative when the defendant did not dispute the fact that the baby was full-term and was born alive). However, "the fact that the State could have made its case using only descriptive words is a consideration in balancing the probative value against the prejudicial effect, but does not mandate exclusion of the photographs." *State v. Willis*, 496 S.W.3d 653, 728 (Tenn. 2016).

Fifty-nine of the exhibits at trial were of the victim post-mortem. Thirty-one post-mortem photographs were admitted in monochrome and were close-up autopsy photographs of the victim's wounds. Seven trial exhibits were color autopsy photographs, and twelve exhibits were color photographs of parts of the victim's body while at the crime scene. The photographs at issue on appeal show the following:

- Trial exhibit 98: Small smear of blood on the door to the victim's apartment.

- Trial exhibit 100: The victim's desk, chair, and bed.

- Trial exhibit 102: The victim's couch with her foot on the seat.

- Trial exhibit 103: Close-up of the victim's right hand and wrist covered in blood.

- Trial exhibit 105: The victim's left arm bent upwards; her left hand in a fist and resting on her chest; and several stab marks on her neck and face. The visible parts of her body are covered in blood.

- Trial exhibit 106: The victim's left leg and ankle up on the couch with several blood spatters on her leg and ankle.

- Trial exhibit 107: A close-up of the blood spatter from trial exhibit 106.

- Trial exhibit 108: The victim's legs, crossed and up on the couch, covered in blood with smears that appear to have been made by fingers or hands; the victim's waist and her shorts below her navel.

- Trial exhibit 109: A close-up of a blood smear on the victim's right side of her waist.

- Trial exhibit 110: The victim's right hand and right arm extended next to a large pool of blood. Her arm and hand are covered in blood.

"We acknowledge that the question of whether a photograph is or is not graphic or gruesome is often a subjective determination, and what may be graphic or gruesome to one person may not be so to another." *Willis*, 496 S.W.3d at 665 (quoting *State v. Curtis Scott Harper*, No. E2014-01077-CCA-R3-CD, 2015 WL 6736747, at *15 (Tenn. Crim. App. Nov. 3, 2015)). "However, at other times a photograph may be so troubling or disturbing that there can be no reasonable question about the graphic or gruesome nature of the photograph." *Id*. In this case, there is no question that several of the above-listed photographs of the victim are graphic. Nevertheless, we must determine whether the photographs were so graphic and gruesome that their probative value was substantially outweighed by the danger of unfair prejudice.

First, we note that trial exhibits 98 and 100 are not gruesome, do not show the victim post-mortem, and do not show an excessive amount of blood. These two exhibits were clearly relevant to show that blood was spattered and smeared in the apartment, which indicated a violent encounter. Tenn. R. Evid. 401, 403. Further, there is nothing particularly graphic about these two photographs. Thus, we conclude that the trial court did not err in admitting trial exhibits 98 and 100. Therefore, our discussion will center on the remainder of the challenged photographs: exhibits 102, 103, and 105-110.

## A. Probative Value

Defendant was charged with first degree premeditated murder. As such, the primary issues at trial to which the post-mortem photographs may have been relevant were whether Defendant acted with intent and premeditation when he stabbed the victim twenty-two times and whether Defendant acted in self-defense. Tenn. Code Ann. § 39-13-202(a)(1) (2017); Tenn. Code Ann. § 39-11-611(b) (2017).

Exhibits 102, 103, and 105-110 clearly show an extensive, brutal attack, helping to disprove Defendant's claim of self-defense. The disparate conditions of Defendant and the victim following the attack -- Defendant with cuts on one hand and the victim with twenty-two stab wounds -- were relevant to show that Defendant was not protecting himself when he attacked the victim. Moreover, the number and depth of the stab wounds were relevant to prove that Defendant acted with intent and premeditation. Finally, exhibit 108 was probative of motive because it shows the bloody, smeared handprints on the victim's legs. From this, a jury could reasonably infer that Defendant tried to pry her legs apart, pointing to a sexual motive for the killing. While trial exhibits 71 and 89, which are not challenged on appeal, show the victim's blood-covered legs from a distance, they do not effectively show the handprint smears. Therefore, we conclude that the exhibits were probative of relevant, contested issues at trial.

## B. Unfair Prejudice

Defendant argues that the probative value of the photographs was substantially outweighed by unfair prejudice.

In *State v. Willis*, the defendant killed two teenagers and dismembered one of them. 496 S.W.3d at 665. The defendant was convicted of two counts of first degree premeditated murder and one count of first degree felony murder in the perpetration of a kidnapping, and he was sentenced to death. *Id*. The defendant appealed, arguing among other things, that the trial court erred in admitting gruesome post-mortem photographs of the victims. *Id*. The photographs at issue in *Willis* from the guilt phase of trial were:

> Trial Exhibits 1 (color photograph of [the male victim's] severed and severely decomposed head); 2 (color photograph of severed hand A); 3 (color photograph of severed hand B); 9 (color photograph of fly larvae at bottom of door to storage unit); 21 (color photograph of fly pupae); 22 (color photograph of collected fly larvae); 34 (color photograph of storage tote A with [the female victim's] body inside); 41 (color photograph of [the male victim's] head, viewed from under chin and depicting bullet hole); 43 (color photograph of piece of [the male victim's] skull); 51 (color photograph of

rear of [the female victim's] head depicting bullet hole); 58 (color autopsy photograph of [the female victim] from the rear, depicting her bound hands and feet); 60 (color photograph of [the female victim's] decomposing head and chest with extensive fly larvae activity[.]

*Id*. at 725.

Citing the *Banks* factors, our supreme court concluded that the trial court did not err in admitting the photographs in *Willis*. *Id*. at 726, 729. It stated,

In this case, because of the advanced state of decomposition of the victims' bodies and the severity of the injuries, all of the photographs were quite disturbing, some of the worst we have seen. . . . [I]t is noteworthy that the trial court found it necessary to take a recess after these photographs were shown because one of the jurors became physically ill at viewing them. It is fair to classify the photos admitted in this case as both graphic and gruesome.

*Id*. at 727. Nevertheless, the court determined that the photographs were all probative of issues disputed at trial: "[T]he locations of the victims' bullet wounds . . . were relevant to the issue of premeditation, and photographs [were] clearly an aid. The depiction of either fly larvae or pupae on the victims' bodies was relevant to show time of death, also a contested issue." *Id*.

On the issue of unfair prejudice, our supreme court in *Willis* analyzed the *Banks* factors, stating that the photographs were accurate, clear, and probative of contested issues at trial. *Id*. at 728. It said that, "[i]n determining whether any prejudice to the defendant was unfair, the trial court could fairly take into account the grotesque and horrifying nature of the conduct charged." *Id*. at 729. The court stated that it need not determine whether the trial court "made the best decision or the one the appellate court would have made" but only whether the trial court abused its discretion. *Id*. Because of the "general policy of liberality" granted to trial courts in admitting photographic evidence, the supreme court concluded that the trial court in *Willis* did not abuse its discretion. *Id*.

Turning to the *Banks* factors in the present case, each of photographs 102, 103, and 105-110 appears to be an accurate and clear representation of the crime scene and were taken before the body was moved. Further, while trial exhibits 102, 103 and 105-107, 109, and 110 showed similar aspects of the victim's injuries as trial exhibits 71, 89, and 221,[8]

---

[8] Trial exhibits 71 and 89, which are not challenged on appeal, showed the victim lying on her apartment floor with stab wounds seeping blood from her face, head, neck, and chest, and showed the victim lying next to a large pool of blood. Trial exhibit 221 was a color autopsy photo of the victim's upper chest up to her nose and showed the twenty-two gaping stab wounds as she lay on the autopsy table.

that does not necessarily render the challenged photographs inadmissible. *See id.* at 728 (quoting *State v. Derek Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at \*9 (Tenn. Crim. App. Aug. 12, 2011)) ("Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used.")

Moreover, intent and premeditation were contested issues at trial because Defendant argued that he acted in self-defense, and these exhibits clearly showed the brutal nature of the crime and rebutted Defendant's claim of self-defense. Although we cannot conclude that the photographs were absolutely necessary to establish the prima facie case of guilt or to rebut Defendant's claim of self-defense, our standard of review is whether the trial court abused its discretion in balancing the *Banks* factors in favor of admission. *Banks,* 564 S.W.2d at 951. We "need not find that the trial court made the best decision or the one the appellate court would have made" but instead must determine "whether the trial court's decision was within the range of acceptable alternatives." *Willis*, 496 S.W.3d at 729. "[F]airly tak[ing] into account the grotesque and horrifying nature of the conduct charged," for a crime as brutal as the one Defendant committed, we cannot conclude that the trial court's decision to admit the photographs "was outside the range of acceptable alternatives." *Id.* at 729. We determine that Defendant "failed to establish that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice," and we conclude that the trial court did not abuse its discretion. *Id.*

## II. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to establish that he was "sufficiently free from excitement and passion" such that the State could establish intent and premeditation.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2017). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2017). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2017). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.* Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Moreover, there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id.* Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003) (citing *Suttles*, 30 S.W.3d at 261; *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

Here, Defendant used a deadly weapon, a blade six and one-half inches long, and stabbed the victim twenty-two times in her face, head, neck, and chest, showing particular cruelty. *See Suttles*, 30 S.W.3d at 261 (Tenn. 2000). Moreover, the force with which Defendant stabbed the victim showed intent and premeditation because the deep, penetrating stab wounds were inflicted with enough force to nearly sever her trachea, to penetrate her spine, to pierce all the way through her wrist, and to break off the tip of the knife into her temporal bone. *See State v. Reid*, 164 S.W.3d 286, 311 (Tenn. 2005) (That "the victims had suffered deep, penetrating stab wounds to their throats; the stab wounds had been inflicted with enough force to penetrate the victims' spines; the stab wounds had been inflicted with a knife blade several inches long; and the victims bled to death in a secluded area" showed that the defendant "acted with intent and with premeditation.") "[T]he succession of blows, the patently vicious manner of their infliction, the enormity of

the cruelty and the horrendous injuries suffered provide further evidence of a wil[l]ful execution of an intent to kill." *State v. Davidson*, 509 S.W.3d 156, 199 (Tenn. 2016) (quoting *Banks*, 564 S.W.2d at 950). The evidence that Defendant acted with intent and premeditation was overwhelming, and any rational juror could find that Defendant acted "sufficiently free from excitement and passion." Tenn. Code Ann. § 39-13-202(d) (2017). Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

 

 

_____
ROBERT L. HOLLOWAY, JR., JUDGE